**ORIGINAL**

STARN O'TOOLE MARCUS & FISHER
A Law Corporation

MARK J. BENNETT          2672-0
BRANDI B. BALANDA        9271-0
733 Bishop Street, Suite 1900
Pacific Guardian Center, Makai Tower
Honolulu, Hawaii 96813
Telephone: (808) 537-6100

Attorneys for Plaintiff
UNIVERSITY OF HAWAII

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2013 JUL 30  AM 8:31
N. ANAYA
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| UNIVERSITY OF HAWAII,<br><br>       Plaintiff,<br><br>  vs.<br><br>LEXINGTON INSURANCE COMPANY,<br>a foreign insurance corporation,<br>JOHN DOES 1-100, JANE DOES<br>1-100, DOE CORPORATIONS 1-100,<br>and/or OTHER DOE ENTITIES 1-100,<br><br>       Defendants. | CIVIL NO. **13-1-2083-07 KKS**<br>(Contract)<br><br>COMPLAINT; EXHIBIT "A";<br>DEMAND FOR JURY TRIAL;<br>SUMMONS |



RECEIVED
$500.00

799630v1



I do hereby certify that this is a full, true, and
correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

COMPLAINT

Plaintiff UNIVERSITY OF HAWAII brings this Complaint against Defendant LEXINGTON INSURANCE COMPANY; JOHN DOES 1-100; JANE DOES 1-100, DOE CORPORATIONS 1-100, AND DOE ENTITIES 1-100 and alleges as follows:

PARTIES AND JURISDICTION

1.     Plaintiff UNIVERSITY OF HAWAII (the "University") is a public educational institution and constitutionally independent corporation created by the Constitution of the State of Hawaii, Article X, § 5.

2.     Defendant LEXINGTON INSURANCE COMPANY ("Lexington") is, on information and belief, a national insurance company which does business in, among other places, the State of Hawaii.

3.     Defendants JOHN DOES 1-100, JANE DOES 1-100, DOE CORPORATIONS 1-100, and/or OTHER DOE ENTITIES 1-100, are persons or entities whose identity is currently unknown to the University, but who may have acted in concert with or on behalf of Lexington, or whose actions may have resulted in harm to the University for which the University seeks relief in this complaint.  The University will identify any such Doe Defendants after discovery has taken place.

4.     The claims for relief arose in the First Circuit of the State of Hawaii, that is, the City and County of Honolulu, Island of Oahu, where the University is located.

5.   The amount at issue in this case exceeds the minimum jurisdictional requirements for suits brought in the Circuit Courts of the State of Hawaii.

<u>FACTS</u>

6.   On or about November 18, 2010, Philippe Gross, individually and on behalf of a class of similarly situated persons ("Gross"), filed a class action lawsuit against the University in the United States District Court for the District of Hawaii, Civ. No. 10-00684 ACK LEK ("Federal Action").

7.   In the Federal Action, Gross sought monetary damages, declaratory and injunctive relief, and attorneys' fees and costs based on allegations that the University made his and other similarly situated persons' confidential information, including social security number and credit card information, publicly available to unauthorized third parties.

8.   More specifically, Gross alleged that the University made his confidential information known to unauthorized third parties through a series of security breaches of the University's information systems.

9.   Gross further alleged that by making his confidential information known to unauthorized third parties, the University violated his right to privacy.

2

10.   Based on this alleged violation of his right to privacy, Gross brought three causes of action: (1) Violation of the Right of Privacy of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (Pursuant to 42 U.S.C. § 1983); (2) Violation of the Right of Privacy of Article I, § 6 of the Constitution of the State of Hawaii; and (3) Declaratory and Injunctive Relief.

11.   The allegations in the Federal Action implicate certain insurance coverage owed by Lexington to the University under a higher education general liability insurance policy between the University and Lexington, Policy No. 003628067, attached hereto as Exhibit A (the "Policy").

12.   More specifically, Section I(A) of the Policy states that Lexington "will pay on behalf of the Insured [the University] those sums in excess of the Retained Amount that the Insured becomes legally obligated to pay as damages because of bodily injury, property damage, **personal and advertising injury** . . . to which this insurance applies."  Exh. A at p. 1 (emphasis added).

13.   "Personal and advertising injury" is defined under the Policy as meaning "injury arising out of your business, including consequential bodily injury, arising out of one or more of the following offenses: (5) Oral or written

3

publication, in any manner, of material that violates a person's right of privacy . . ." Id. at p. 20.

14. Under these provisions, among others, the Policy requires Lexington to pay on behalf of the University those sums in excess of $150,000 (the Retained Limit) that the University becomes legally obligated to pay as damages because of an alleged oral or written publication, in any manner, of material that violates a person's right of privacy.

15. Thus, because Gross alleged the University made his (and others') confidential information known to unauthorized third parties in violation of his right to privacy, this constitutes a "personal and advertising injury" under the Policy.

16. Accordingly, on or about November 23, 2010, the University provided written notice to Lexington of the Federal Action, and its coverage claim under the Policy.

17. The University did not receive any response from Lexington.

18. Thereafter, Gross made a settlement demand to the University.

19.   In that demand, Gross offered the University a proposed settlement of monetary damages that mainly included: costs to fund a credit monitoring program to control and respond to the harm caused by the University allegedly making Gross (and others') confidential information known to unauthorized third parties; a monetary payment to Gross; and payment to Gross for his attorneys' fees.

20.   The University provided Lexington with a copy of that settlement demand, and kept Lexington informed as to the Federal Action, specifically including the parties' settlement efforts and negotiations.

21.   Negotiations between the University and Gross broke down after Gross demanded $1 million in attorneys' fees as part of the settlement.

22.   The litigation moved forward, and the University defended itself in the Federal Action by filing a motion to dismiss.

23.   On or about June 14, 2011, shortly after receiving the University's motion, Gross filed a class action lawsuit against the University in the Circuit Court of the First Circuit of the State of Hawaii, Civ. No. 11-1-1217-06 PWB ("State Action").  The State Action and the Federal Action are, collectively, the "Lawsuit."

24.   In his State Action, Gross made the same allegations against the University that he made in his Federal Action – that the University made his (and others') confidential information known to unauthorized third parties through a series of information security breaches.

25.   Based on those allegations, Gross sought money damages for negligence pursuant to the Hawaii State Tort Claims Act, Haw. Rev. Stat. Ch. 662.

26.   The University notified Lexington of the State Action shortly after it was filed, and continued to keep Lexington informed regarding the status of the Lawsuit, and the parties' efforts to resolve it.

27.   During that time, Lexington repeatedly and affirmatively represented to the University that one retained limit of $150,000 applied to the Lawsuit.

28.   The University relied on those representations when it engaged in further settlement negotiations with Gross, which resulted in another settlement proposal.  The settlement proposal did not account for any payment allocation based on the discrete security breaches Gross alleged in his lawsuit.

29.   Instead, the settlement proposal globally addressed the Lawsuit, which included allegations of Gross (and others) being continuously exposed to generally the same harmful conditions of the University improperly or insufficiently securing his confidential information such that the University made that information known to unauthorized third parties.

30.   That settlement proposal included: dismissal of both the Federal Action and the State Action; monetary payments of between approximately $470,000 and $520,000 for a Kroll credit monitoring contract to limit and mitigate against the harm caused by the University allegedly making Gross and others' confidential information known to unauthorized third parties; payment to Gross as the class representative of $2,500; payment of $150,000 for his attorney's fees; no settlement fund; counsel for Gross to pay for any website; and the University to pay for publication of the notice.

31.   In September 2011, Lexington responded to the University and the proposed settlement by acknowledging that the damages alleged by Gross in the Lawsuit fall within the "personal and advertising injury" definition under the Policy. Again, Lexington affirmatively represented to the University that a single retained limit of $150,000 applied to the Lawsuit.

32.   However, Lexington refused to pay any sums to the University as required under the Policy, telling the University that the remedial credit monitoring costs do not constitute "property damage," and, thus, would not be covered under the Policy.

33.   Lexington further stated that making any settlement payment would constitute a "voluntary" payment under the Policy that is not covered – even though *Lexington* refused to consent to the settlement payments.  This denial of coverage is not based on any reasonable interpretation of the Policy.

34.   The University notified Lexington that its denial was unreasonable, and breached Lexington's contractual obligations under the Policy.

35.   Regardless of Lexington's position, the University continued to keep Lexington informed of the settlement discussions and proposals between the University and Gross.

36.   In early 2012, the University and Gross finalized the proposal and reached an agreement to settle the Lawsuit.

37.   Again, the University notified Lexington of its claim under the Policy, the finalized settlement agreement, and the damages the University would likely be legally obligated to pay thereunder.

38.   Lexington responded to the University by unreasonably denying coverage based on three reasons, none of which constitute a reasonable interpretation of the Policy:

a.   Directly contradicting its previous affirmative representations to the University, Lexington now claims that the Lawsuit does not satisfy the definition of "personal and advertising injury;"

b.   Directly contradicting its previous affirmative representations to the University, Lexington now claims that the Lawsuit constitutes multiple occurrences such that multiple, rather than a single $150,000 self retained limit, applies to the Lawsuit; and, there is no way to tell under the settlement the allocation of payments; and

c.   Lexington claims the University made a "voluntary" payment because it did not obtain Lexington's consent to the settlement, when *Lexington* unreasonably refused to provide its consent.

39.   To date, Lexington refuses to pay the University any sums that the University has become legally obligated to pay in connection with the Lawsuit under the Policy.

40.   New reasons to deny coverage that contradict Lexington's previous positions evidence Lexington's bad faith refusal to evaluate and honor its contractual obligations under the Policy.

41.   For example, the University relied on Lexington's affirmative representations that a single self retained limit applied to the Lawsuit when structuring the settlement to address the alleged damages caused by the University allegedly continuously and repeatedly exposing Gross (and others) to the same generally harmful conditions of having their personal confidential information allegedly made known by the University to unauthorized third parties.

42.   Further, Lexington had previously acknowledged that the allegations contained in the Lawsuit fell within the definition of "personal and advertising injury" contained in the Policy, and Lexington's current denial of coverage based on a new claim that the definition is not satisfied is additional evidence of Lexington's bad faith conduct with respect to its coverage obligations under the Policy.

43.   Lexington's refusal to pay the University the sums that Lexington is legally obligated to pay in connection with the Lawsuit (excluding $150,000 under the applicable self retained limit) is not based on any reasonable interpretation of the Policy.

COUNT I
BREACH OF CONTRACT

44.   The University realleges and hereby incorporates by reference paragraphs 1 - 43, inclusive, as if set forth fully herein.

45.   The Policy (attached hereto as Exhibit A) is an enforceable contract between the University and Lexington.

46.   Under the Policy, Lexington is contractually obligated to pay the University those sums in excess of the $150,000 retained limit that the University became legally obligated to pay as damages because of the "personal and advertising injury" alleged in the Lawsuit, which includes attorneys' fees and costs the University incurred defending itself in the Lawsuit.

47.   Lexington breached its contractual obligations under the Policy, as specifically set forth herein, by delaying and ultimately refusing to pay any sums to the University that the University became legally obligated to pay as damages in connection with the Lawsuit as required under the Policy.

48.   As a result of this breach of contract, the University has suffered significant monetary damages in an amount to be proven at trial.  These damages include, but are not limited to, the amount exceeding $150,000 that the University paid in connection with the Lawsuit and its settlement, including its attorneys' fees and costs.

49.   As a result of Lexington's breach of contract, the University has suffered additional general, consequential, and special damages in an amount to be proven at trial

COUNT II
BREACH OF THE CONTRACTUAL IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING

50.   The University realleges and hereby incorporates by reference paragraphs 1 - 49, inclusive, as if set forth fully herein.

51.   Lexington's actions set forth above constitute not only a breach of the express provisions of the Policy, but, in addition, a breach of the implied covenant of good faith and fair dealing inherent in all contracts in the State of Hawaii – including the Policy.

52.   Lexington breached the implied covenant of good faith and fair dealing by acting in a commercially unreasonable manner by, among other things: (1) refusing to pay the University sums that Lexington was required to pay under the plain language of the Policy based on Policy interpretations that contradict settled law and Lexington's prior representations, and are otherwise unreasonable; and (2) otherwise denying coverage under the Policy based on legally and factually unsupported positions.

53.   In addition, Lexington frustrated the purpose of the Policy by, among other things, refusing to provide coverage for and pay the University sums as Lexington is clearly contractually required to do under the plain language of the Policy.

54.   Lexington's actions alleged herein frustrated the University's justified expectations of coverage for the Lawsuit under the Policy.

55.   As a result of Lexington's breach of the implied covenant of good faith and fair dealing, the University has suffered general, consequential, and special damages in an amount to be proven at trial.

COUNT III
TORT OF INSURER BAD FAITH

56.   The University realleges and hereby incorporates by reference paragraphs 1 – 55, inclusive, as if set forth fully herein.

57.   As an insurer, Lexington has a tort law duty to act in good faith towards the University with respect to the Policy, and the University's claim for coverage thereunder.

58.   Lexington's actions set forth above breached its tort law duty to act in good faith towards the University with respect to the Policy and the University's claim for coverage thereunder.

13

59.   Lexington acted in bad faith by, among other things, unreasonably refusing to pay the University any sums that the University is legally obligated to pay in connection with the Lawsuit, and unreasonably refusing to consent to the settlement with Gross.

60.   Not only is Lexington's conduct based on unreasonable interpretations of the Policy, but changing positions with respect to coverage and refusing coverage based on reasons that directly contradict Lexington's prior affirmative representations to the University further evidence Lexington's bad faith.

61.   As a result of Lexington's breach of its tort law duty of good faith, the University has suffered damages in an amount to be proven at trial.

62.   Lexington's actions were willful, wanton, malicious, outrageous, oppressive, and/or committed with a conscious indifference to the consequences resulting there from, and consequently, the University is entitled to an award of punitive damages.

COUNT IV
DECLARATORY RELIEF

63.   The University realleges and incorporates by reference paragraphs 1 - 62, inclusive, as if set forth fully herein.

64.   An actual controversy exists between the University and Lexington regarding rights and obligations under the Policy.

65.   Based on the allegations contained herein, Lexington is required under the Policy to provide coverage for the damages the University is legally obligated to pay in connection with the Lawsuit that exceed the $150,000 retained limit.

66.   Accordingly, the University is entitled to a declaration that:

a.   The Policy is an enforceable contract between Lexington and the University;

b.   A single self retained limit of $150,000 applies to the Lawsuit;

c.   Lexington is required to pay all sums the University is legally obligated to pay in connection with the Lawsuit that exceed the $150,000, including the University's attorneys' fees and costs; and

d.   Lexington's refusal to pay any sums under the Lawsuit is not based on a reasonable interpretation of the Policy, and constitutes bad faith, in breach of both the implied covenant of good faith and fair dealing inherent in the Policy, and in breach of Lexington's tort duty of good faith.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the University respectfully requests that this Court enter and issue a judgment in its favor against Lexington as follows:

1.    For damages in an appropriate amount to be proven by the University;

2.    For the declaratory relief requested herein;

3.    For costs, attorneys' fees, and prejudgment interest; and

4.    For other such and further relief which the Court may deem appropriate and warranted here.

DATED:   Honolulu, Hawaii, _____.

JUL 3 0 2013

_____

MARK J. BENNETT
BRANDI B. BALANDA

Attorneys for Plaintiff
UNIVERSITY OF HAWAII

16

# LEXINGTON INSURANCE COMPANY
**Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103**
(hereinafter called the Company)

## LEXINGTON HIGHER EDUCATION RETAINED AMOUNT LIABILITY POLICY
### (OCCURRENCE FORM)

### DECLARATIONS

**Policy No.:**  003628067                              **Renewal of:** 007360165

**Item 1.**   **Named Insured and Address:**
UNIVERSITY OF HAWAII

2444 DOLE STREET
BACHMAN HALL #112
HONOLULU, HI 96822

The Named Insured is: ☐ Individual ☐ Partnership ☐ Joint Venture ☐ Limited Liability Company
☒ Organization (other then a Partnership or Joint Venture)

The Business of the Named Insured is: UNIVERSITY

**Item 2.**   **Policy Period: From: 09/01/2009  To: 09/01/2010**
(12:01 A.M., standard time at the address of the Named Insured as stated herein.)

**Item 3.**   **Limits of Insurance:**

Each Occurrence Limit:                                  $5,000,000
General Aggregate Limit:                                $5,000,000
Products-Completed Operations Aggregate Limit: $5,000,000

**Item 4.**   **Premium:**

**A.** Total Advance Premium:          $413,600
**B.** Annual Minimum Premium:         $413,600
**C.** Minimum Earned Premium:         $144,760

**Item 5.**   **Schedule of Retained Amounts:**

See Schedule of Retained Amounts forming part of this Policy.

**The policy is comprised of this Declarations page, the policy form and the schedules and endorsements, if any, attached at inception or during the Policy Period.**

*David Bresnahan*

**Authorized Representative OR**
**Countersignature (In states where applicable)**

LX8443 (01/09)

# EXHIBIT A

# FORMS SCHEDULE

Named Insured:   UNIVERSITY OF HAWAII

Policy No:  003628067                                    Effective Date:   09/01/2009

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| LX8443 | 01/09 | | HIGHER ED RETAINED (OCC) DEC |
| LX8444 | 01/09 | | HIGHER ED RETAINED (OCC) TEXT |
| LX8031 | 01/07 | 001 | PATROL ACCESS ENDORSEMENT |
| LEXCME077 | 03/86 | 002 | MINIMUM EARNED PREMIUM |
| LX9606 | 06/03 | 003 | EMPLOYEE BENEFITS LIAB COV |
| 96554 | 04/08 | 004 | TERRORISM EXCL CERT & NON-CERT |
| LX9803 | 08/05 | 005 | ANTI-STACKING ENDORSEMENT |
| LX5184 | 11/85 | 006 | A.I. DESIGNATED PERSON OR ORG |
| LX8465 | 03/09 | 007 | LIMITED POLLUTION COVERAGE |
| XCME081 | 09/02 | 008 | NO FAULT/UNINS MOTOR/PI EXCL |
| LX8416 | 09/08 | 009 | ACCIDENT INSURANCE ENDT |
| LX8364 | 04/08 | 010 | CRISIS RESPONSE COV EXTENSION |
| MANUSCRIPT | | 011 | PREMIUM & AUDIT AMENDATORY |
| MANUSCRIPT | | 012 | LIMITS OF INS AMENDATORY ENDT |

DOC018(Ed.12/87)
LX0295

# *LEXINGTON* INSURANCE COMPANY
### 100 Summer Street, Boston, Massachusetts 02110

### LEXINGTON HIGHER EDUCATION RETAINED AMOUNT LIABILITY POLICY
### OCCURRENCE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words **you** and **your** refer to the **Named Insured** shown in the Declarations and any other person or organization qualifying as an **Named Insured** under this policy.  The words **we, us** and **our** refer to the company providing this insurance.

Words that appear in boldface type have special meaning.  Refer to SECTION V - DEFINITIONS.

## SECTION I - INSURING AGREEMENT – RETAINED AMOUNT LIABILITY

**A.** We will pay on behalf of the **Insured** those sums in excess of the **Retained Amount** that the **Insured** becomes legally obligated to pay as damages because of **bodily injury, property damage, personal and advertising injury, incidental medical malpractice injury,** or a **law enforcement services wrongful act,** to which this insurance applies.

This insurance only applies to those coverages shown on the Schedule of Retained Amounts.  The amount we will pay is limited as described in SECTION IV - LIMITS OF INSURANCE.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under the definition of **defense expenses.**



**B.** With respect to **bodily injury, property damage,** or **incidental medical malpractice injury,** this insurance applies, only if:

    **1.** The **bodily injury, property damage,** or **incidental medical malpractice injury,** is caused by an **occurrence** that takes place in the **coverage territory;** and

    **2.** The **bodily injury property damage,** or **incidental medical malpractice injury** occurs during the **policy period;** and

    **3.** Prior to the **policy period,** no **Insured** shown in Paragraph M.2.a. of SECTION V - DEFINITIONS and, no officer, no manager in your risk management, insurance or legal department and no **employee** who was authorized by you to give or receive notice of an **occurrence,** claim or **suit,** knew that the **bodily injury, property damage** or **incidental medical malpractice injury** had occurred, in whole or in part.  If such an **Insured,** officer, manager or authorized **employee** knew, prior to the **policy period,** that the **bodily injury, property damage** or **incidental medical malpractice injury** had occurred, then any continuation, change or resumption of such **bodily injury, property damage, incidental medical malpractice injury** during or after the **policy period** will be deemed to have been known prior to the **policy period.**

**C.** With respect to **personal and advertising injury,** this insurance applies to **personal and advertising injury** caused by offense arising out of your business, but only if the offense was committed in the **coverage territory** during the **policy period.**

**D.** Notwithstanding Paragraphs B. and C. above, with respect to a **law enforcement services wrongful act,** this insurance applies, only if

    **1.** The **law enforcement services wrongful act** was committed in the **coverage territory** during the **policy period,** and

2.  Prior to the **policy period**, no **Insured** shown in Paragraph M.2.a. of SECTION V - DEFINITIONS and, no officer, no manager in your risk management, insurance or legal department and no **employee** who was authorized by you to give or receive notice of an **claim** or **suit**, knew that the **law enforcement services wrongful act** had occurred, in whole or in part.  If such an **Insured**, officer, manager or authorized **employee** knew, prior to the **policy period**, that the **law enforcement services wrongful act** had occurred, then any continuation, change or resumption of such **law enforcement services wrongful act** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

E.  **Bodily injury, property damage, personal and advertising injury, incidental medical malpractice injury** or a **law enforcement services wrongful act** which occurs during the **policy period** and was not, prior to the **policy period**, known to have occurred by any **Insured** shown in Paragraph M.2.a. of SECTION V - DEFINITIONS or any officer, any manager in your risk management, insurance or legal department or any **employee** authorized by you to give or receive notice of an **occurrence**, offense, **law enforcement services wrongful act**, claim or **suit**, includes any continuation, change or resumption of that **bodily injury, property damage, personal and advertising injury, incidental medical malpractice injury,** or a **law enforcement services wrongful act** after the end of the **policy period**.

F.  **Bodily injury, property damage, personal and advertising injury, incidental medical malpractice injury** or a **law enforcement services wrongful act** will be deemed to have been known to have occurred at the earliest time when any **Insured** shown under Paragraph M.2.a. of SECTION V. DEFINITIONS, any officer, any manager in your risk management, insurance or legal department or any **employee** who was authorized by you to give or receive notice of an **occurrence**, offense, **law enforcement services wrongful act**,, claim or **suit**:

1.  Reports all, or any part, of the **bodily injury, property damage personal and advertising injury** , **incidental medical malpractice injury,** or **law enforcement services wrongful act** to us or any other insurer;

2.  Receives a written or verbal demand or claim for damages because of the **bodily injury, property damage personal and advertising injury, incidental medical malpractice injury,** or **law enforcement services wrongful act; or**

3.  Becomes aware by any other means that **bodily injury, property damage, incidental medical malpractice injury** or **law enforcement services wrongful act** has occurred or has begun to occur or that an offense has been committed that has caused or may cause **personal and advertising injury.**

G.  Damages because of **bodily injury** or **incidental medical malpractice injury** include damages claimed by any person or organization for care, loss of services or death resulting at any time from the **bodily injury** or **incidental medical malpractice injury.**

## SECTION II - DEFENSE PROVISIONS

A.  We will have the right and duty to defend any **suit** against the **Insured** that seeks damages for **bodily injury, property damage personal and advertising injury, incidental medical malpractice injury,** or a **law enforcement services wrongful act**, even if the **suit** is groundless, false or fraudulent when the **Retained Amount** has been exhausted by payment of damages to which this insurance applies.

B.  Within the **Retained Amount**, we will have the right, but not the duty, to participate in the defense of any **suit** and the investigation of any claim to which this insurance may apply.  If we exercise this right, we will do so at our own expense.

C.  When we assume the defense of any **suit** against the **Insured** that seeks damages to which this insurance applies, we will pay **defense expenses** in addition to the limits of insurance.

D.  In no event shall you agree to a settlement in excess of the **Retained Amount** without our prior written approval.

. We may, at our sole discretion, settle any **occurrence**, claim or **suit** in excess of the **Retained Amount** to which this insurance applies. If you refuse to agree to a settlement we recommend and the resulting judgment or settlement exceeds our recommended settlement, our liability for that **occurrence**, claim or **suit**, subject to the limits of insurance, will not exceed our recommended settlement amount plus 50% of the judgment or settlement in excess of our recommended settlement and 50% of the **defense expenses** incurred after we recommended the settlement (less any **Retained Amount**).

F. We will not defend any **suit** or pay any **defense expenses** that accrue after the applicable limits of insurance of this policy have been exhausted by the payment of damages, we will have the right to withdraw from the further defense of such **suit** by tendering control of said defense to the **Insured**.

## SECTION III - EXCLUSIONS

**NOTICE:  ANY EXCLUSION WHICH APPLIES TO BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL AND ADVERTISING INJURY SHALL ALSO APPLY TO BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL AND ADVERTISING INJURY ARISING OUT OF A LAW ENFORCEMENT SERVICES WRONGFUL ACT.**

This insurance does not apply to:

A. **Expected or Intended Injury with Exceptions for: (1) Corporal Punishment, (2) Use of Reasonable Force, and (3) Use of Reasonable and Excess Force by Law Enforcement**

**Bodily injury, property damage**, or **incidental medical malpractice injury** expected or intended from the standpoint of the **Insured**.  This exclusion does not apply to:

1. **Bodily injury** resulting from the use of reasonable force to protect persons or property,

2. **Bodily injury** resulting from corporal punishment to your students administered by or at the direction of any **insured**, or

3. **Bodily injury** resulting from the use of reasonable or excessive force directly by an **Insured** or independent contractor while conducting law enforcement or security activities related to the conduct of your business and within the scope of the **Insured's** or independent contractor's duties for you.

B. **Contractual Liability**

**Bodily injury, property damage**, or **incidental medical malpractice injury** for which the **Insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

1. That the **Insured** would have in the absence of the contract or agreement; or

2. Assumed in a contract or agreement that is an **insured contract** provided the **bodily injury property damage**, or **incidental medical malpractice injury** occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an **insured contract** reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **Insured** are deemed to be damages because of **bodily injury property damage**, or **incidental medical malpractice injury** and included within the limits of insurance, provided:

   a. Liability to such party for, or for the cost of, that party's defense has also been assumed in the same **insured contract**; and

   b. Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

C. **Exclusion Deleted [Intentionally Left Blank to Maintain Order of Exclusions]**

**Workers' Compensation and Similar Laws**

Any obligation of the **Insured** under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

E.  **Employer's Liability**

1.  **Bodily injury** to an **employee** of the **Insured** arising out of and in the course of:

    a.  Employment by the **Insured**; or

    b.  Performing duties related to the conduct of the **Insured's** business; or

2.  Any claim or **suit** brought by the spouse, child, parent, brother or sister of that **employee** as a consequence of paragraph 1 above.

This exclusion applies:

1.  Whether the **Insured** may be liable as an employer or in any other capacity; and

2.  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the **Insured** under an **insured contract**.

This exclusion does not apply if Employers Liability is included as a Type of Coverage on the Schedule of Retained Amounts.

**Pollution**

1.  Any **bodily injury, property damage personal and advertising injury** or **incidental medical malpractice injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** anywhere at any time.

    However, this exclusion does not apply to **bodily injury, property damage** or **incidental medical malpractice injury** arising out of heat, smoke or fumes from a **hostile fire** unless that **hostile fire** occurred or originated:

    a.  At any premises, site or location which is or was at any time used by or for any **Insured** or others for the handling, storage, disposal, processing or treatment of waste; or

    b.  At any premises, site or location on which any **Insured** or any contractors or subcontractors working directly or indirectly on any **Insured's** behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, **pollutants**.

2.  Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that the **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

3.  Any loss, cost or expense arising out of any claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of **pollutants**.

**G. Aircraft Or Watercraft**

**Bodily injury** or **property damage** arising out of the ownership, maintenance, use or entrustment to others of any aircraft, or watercraft owned or operated by or rented or loaned to any **Insured**. Use includes operation and **loading or unloading.**

This exclusion applies even if the claims against any **Insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that **Insured**, if the **occurrence** which caused the **bodily injury** or **property damage** involved the ownership, maintenance, use or entrustment to others of any aircraft, or watercraft that is owned or operated by or rented or loaned to any **Insured**.

This exclusion does not apply to:

1. An aircraft you do not own that is charted by you and operated by a professional crew, provided that, notwithstanding any other provision of this policy to the contrary, the insurance provided under this provision, shall be excess over any other valid and collectible insurance available, whether primary, excess, contingent or on any other basis, except for insurance purchased specifically by you to be excess of this policy;

2. A watercraft while ashore on premises you own or rent;

3. A watercraft that is:

   a. Less than 52 feet long (whether or not owned by you); and

   b. Not being used to carry persons or property for a charge;

4. Any rowing shell or scull regardless of length; or

5. Liability assumed under any **insured contract** for the ownership, maintenance or use of aircraft or watercraft.

**H. Mobile Equipment**

**Bodily injury** or **property damage** arising out of:

1. The transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to any **Insured**; or

2. The use of **mobile equipment** in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.  However this exclusion does not apply to the use of **mobile equipment** in, or while practicing for, or while being prepared for, any school sponsored, school approved, or school sanctioned racing event including but not limited to Mini-Baja races.

**I. War**

**Bodily injury, property damage, personal and advertising injury**, or **incidental medical malpractice injury** however caused, arising directly or indirectly out of:

1. War, including undeclared or civil war; or

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

This exclusion does not apply to the use or threaten use of **terrorism**.

As used in this exclusion, **terrorism** means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

1.  A government;

2.  The civilian population of a country, state or community; or

3.  To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the **Act**) is in effect, **terrorism** includes an act of terrorism as defined by Section 102. Definitions of the Act and any revisions or amendments thereto.

**J.  Damage to Property**

**Property damage** to:

1.  Property:

    a.  You own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or

    b.  Owned or transported by the **Insured** and arising out of the ownership, maintenance or use of a **auto**;

2.  Premises you sell, give away or abandon, if the **property damage** arises out of any part of those premises;

3.  Property loaned to you;

4.  Personal property in the care, custody or control of the **Insured**;

5.  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the **property damage** arises out of those operations; or

6.  That particular part of any property that must be restored, repaired or replaced because **your work** was incorrectly performed on it.

Paragraph 2 of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by you.

Paragraphs 1b, 3, 4, 5 and 6 of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph 3 and 4 of this exclusion do not apply to liability assumed under a written Trailer Interchange Agreement.

Paragraph 6 of this exclusion does not apply to **property damage** included in the **products-completed operations hazard**.

K. **Damage to Your Product**

**Property damage** to **your product** arising out of it or any part of it.

L. **Damage to Your Work**

**Property damage** to **your work** arising out of it or any part of it and included in the **products-completed operations hazard.**

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

M. **Damage to Impaired Property or Property Not Physically Injured**

**Property damage** to **impaired property** or property that has not been physically injured, arising out of:

1. A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or

2. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

N. **Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1. **Your product;**

2. **Your work;** or

3. **Impaired property;**

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

O. **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

P. **Fungus/Mold**

**Bodily injury, property damage** or **incidental medical malpractice injury** or any other loss, cost or expense, including, but not limited to losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

1. Any **fungus(i), molds(s)**, mildew or yeast, or

2.  Any **spore(s)** or toxins created or produced by or emanating from such **fungus(i)**, **mold(s)**, mildew or yeast, or

3.  Any substance, vapor, gas, or other emission or organic or inorganic body substance produced by or arising out of any **fungus(i)**, **mold(s)**, mildew or yeast, or

4.  Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any **fungus(i)**, **mold(s)**, mildew, yeast or **spore(s)** or toxins emanating therefrom, regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that **bodily injury** or **property damage**, loss, cost or expense.

However, this exclusion does not apply to: (1) any **fungi** or **bacteria** on or contained in a product intended for human consumption served or sold by your college, university, or school, or (2) any **fungi** or **bacteria** used in experiments or part of any research conducted in your college, university, or school laboratory.

For the purpose of this exclusion, the following definitions are added to the policy:

**Fungus(i)** includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including molds, rusts, mildews, smuts, and mushrooms.

**Mold(s)** includes, but is not limited to, any superficial growth produced on damp or decaying organic matter of on living organisms, and fungi that produce molds.

**Spore(s)** means any dormant or reproductive body produced by or arising or emanating out of any **fungus(i)**, **mold(s)**, mildew, plants, organisms or microorganisms.

**Q.  Employment Related Practices**

Any claim or **suit** alleging or asserting in any respect loss, injury, or damage (including consequential **bodily injury**) in connection with **wrongful termination**, and/or **discrimination**, and/or **sexual harassment**.

The following definitions apply to this exclusion:

**Wrongful termination** means termination of an employment relationship in a manner which is against the law and wrongful, or in breach of an implied agreement to continue employment.

**Discrimination** means termination of an employment relationship or a demotion, or a failure or refusal to hire or promote an individual because of race, color, religion, age, sex, disability, pregnancy, natural origin, sexual orientation or other protected category or characteristic established pursuant to any applicable federal, state, or local law, regulation, or ordinance.

**Sexual harassment** means unwelcome sexual advances and/or requests for sexual favors and/or other verbal or physical conduct of a sexual nature that (1) are made a condition of employment and/or (2) are used as a basis for employment decisions and/or (3) create a work environment that interferes with performance.

**R.  Asbestos**

1.  **Bodily injury** or **incidental medical malpractice injury** in any way arising out of the use by any person or organization of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

2.  **Property damage** to real property arising out of the use by any person or organization of asbestos, asbestos products, asbestos fibers, asbestos dust, including without limitation the costs incurred with respect to the removal or abatement of asbestos, asbestos products, asbestos fibers or asbestos dust from or in such real property;

3. Any obligation of the **Insured** to indemnify any party because of damages arising out of such **property damage**, **bodily injury**, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury, at any time as a result of the manufacture of, mining of, use of, sale of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

4. Any obligation to defend any claim or **suit** against the **Insured** alleging **bodily injury**, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury or **property damage** resulting from or contributed to, by any and all manufacture of, mining of, use of, sale of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

## S.  Lead

1. **Bodily injury, property damage, personal and advertising injury** or **incidental medical malpractice injury** for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever;

2. The costs of clean up or removal of lead or products and materials containing lead;

3. The costs of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, or lead or products and material containing lead;

4. The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

5. The cost of compliance with any law or regulation regarding lead.

However, this exclusion does not apply to **bodily injury** or **property damage** arising out of use of lead as part of research conducted in your college, university, or school laboratory.

## T.  Nuclear

1. **Bodily injury property damage** or **incidental medical malpractice injury** :

   a. With respect to which an **Insured** under the policy is also an **Insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association or Canada or any such policy but for its termination upon exhaustion of its limit of liability; or

   b. Resulting from the **hazardous properties** of **nuclear material** and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, of (ii) the **Insured** is or had this policy not been issued would be, entitled to indemnify from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency there of with any person or organization.

2. **Bodily injury, property damage** or **incidental medical malpractice injury** resulting from the **hazardous properties** of **nuclear material**, if:

   a. The **nuclear material** (i) is at any **nuclear facility** owned by, or operated by or on behalf of, an **Insured** or (ii) has been discharged or dispersed therefrom;

   b.  The **nuclear material** is contained in **spent fuel** or **waste** at anytime possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Insured**; or

   c.  The **bodily injury** or **property damage** arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility.**

3.  **Bodily injury, property damage** or **incidental medical malpractice injury** resulting from the intentional or unintentional detonation of any nuclear bomb or nuclear device.

4.  As used in this exclusion, the following definitions apply;

   a.  **Hazardous properties** include radioactive, toxic or explosive properties;

   b.  **Nuclear material** means **source material, special nuclear material** or **by-product material;**

   c.  **Source material, special nuclear material** and **by-product material** have the meanings given them in Atomic Energy Act of 1954 or in any law amendatory thereof;

   d.  **Spent fuel** means any fuel element of fuel component, solid or liquid which has been used or exposed to radiation in a **nuclear reactor;**

   e.  **Waste** means any waste material (l) containing **by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium form any ore processed primarily for its **source material** content, and (ii) resulting from the operation by any person or organization of any **nuclear facility** included under the first two paragraphs of the definition of **nuclear facility;**

   f.  **Nuclear facility** means:

     **(i)**  Any **nuclear reactor;**

     **(ii)**  Any equipment or device designed or used for (a) separating the isotopes or uranium or plutonium, (b) processing or utilizing **spent fuel,** or (c) handling, processing or packaging **waste;**

     **(iii)**  Any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more that 250 grams of uranium 235;

     **(iv)**  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal or **waste;**

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**U.**  **Securities and Financial Interest**

Any liability arising out of:

1.  Any violation of any securities law or similar law or any regulation promulgated thereunder;

2.  The purchase, sale, offer of sale or solicitation of any security, debt, insurance policy, bank deposit or financial interest or instrument;

3.  Any representation made at any time in relation to the price or value of any security, debt, insurance policy, bank deposit or financial interest or instrument; or

4. Any depreciation or decline in price or value of any security, debt, insurance policy, bank deposit or financial interest or instrument.

**V. Silica**

1. **Bodily injury, incidental medical malpractice injury,** sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury, and/or any other type of injury, loss, cost, damage, or expense sustained by any person for the real or alleged emergence, contraction, aggravation or exacerbation of any form of silicosis or any other disease of the human body caused by, arising out of, or resulting from the manufacture, mining, use, sale, removal, or distribution by any person or organization of silica, silica products, silica fibers or silica dust, or the exposure to silica, silica products, silica fibers or silica dust; or

2. Any obligation of the **Insured** to defend and/or indemnify any party because of damages arising out of such **bodily injury, incidental medical malpractice injury,** sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury, at any time caused by, arising out of, or resulting from the manufacture of, mining of, use of, sale of, removal of, distribution of, or exposure to silica, silica products, silica fibers or silica dust.

**W. Violation Of Statutes In Connection With Sending, Transmitting Or Communicating Any Material Or Information**

Any claim or **suit** alleging or asserting that any act or omission violates any statute, ordinance or regulation of any federal, state or local government, including any amendment of or addition to such laws, that includes, addresses or applies to the sending, transmitting or communicating of any material or information, by any means whatsoever.

**X. E.R.I.S.A.**

Any obligation of the **Insured** under the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985), or any amendment or revision thereto, or any similar law or regulation.

**Y. Radioactive Matter**

**Bodily injury, property damage,** claims, losses or expenses arising out of the actual, alleged, or threatened exposure of persons or property to any radioactive matter.

However, this exclusion does not apply if the liability results from the use of radioactive material by you for research purposes.

**Z. Other Personal and Advertising Injury**

**Personal and advertising injury:**

1. Caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury.**

2. Arising out of oral or written publication of material, if done by or at the direction of the **Insured** with knowledge of its falsity.

3. Arising out of oral or written publication of material whose first publication took place before the beginning of the **policy period.**

4. Arising out of a criminal act committed by or at the direction of the **Insured.**

5. For which the **Insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement.

6. Arising out of a breach of contract, except an implied contract to use another's advertising idea in your **advertisement.**

7. Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your **advertisement.**

8. Arising out of the wrong description of the price of goods, products or services stated in your **advertisement.**

9. Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. However, this exclusion does not apply to infringement, in your **advertisement,** of copyright, trade dress or slogan.

10. Committed by an **Insured** whose business is:

    a. Advertising, broadcasting, publishing or telecasting;

    b. Designing or determining content of websites for others; or

    c. An internet search, access, content or service provider.

    However, this exclusion does not apply to Paragraphs 1, 2 and 3 of the definition of **personal and advertising injury** in SECTION V - DEFINITIONS. This exclusion also does not apply to your college, university, or school: (1) newspaper, (2) radio broadcasts, (3) television broadcast, (4) website (provided that, you control the content of this website), (5) books, or (6) research papers.

    For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

11. Arising out of an electronic chatroom or bulletin board the **Insured** hosts, owns, or over which the **Insured** exercises control.

    However, this exclusion does apply to **website injury** if the electronic chatroom or bulletin board is owned by you or made part of **your website.**

12. Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or meta tag, or any other similar tactics to mislead another's potential customers.

**AA. Physician, Dentist, Nurse, Athletic Trainer, Personal Fitness Trainer, or Other Medical Practitioner**

**Incidental medical malpractice injury** to any physician, dentist, nurse, athletic trainer, personal fitness trainer, or other medical practitioner employed or retained by you.

**BB. Services Rendered Outside of Scope of Employment at Your Clinic or College/University Sponsored Activity**

**Incidental medical malpractice injury** caused by, arising out of, or resulting from, professional health care services rendered or failed to be rendered by any physician, dentist, nurse, athletic trainer, personal fitness trainer, or other medical practitioner employed or retained by you if such services were rendered outside of the scope of employment at your **clinic** or college/university sponsored activity.

**SECTION IV - LIMITS OF INSURANCE**

A.  The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay for all damages under this policy regardless of the number of:

   1.  **Insureds;**

   2.  Claims made or **suits** brought; or

   3.  Persons or organizations making claims or bringing **suits.**

B.  The General Aggregate Limit is the most we will pay for all damages under this policy, except for:

   1.  Damages included within the **products-completed operations hazard** to which this insurance applies; and

   2.  Damages because of **bodily injury** or **property damage** to which this insurance applies, caused by an **occurrence** and resulting from the ownership, maintenance or use of an **auto**, which is not subject to any aggregate limit.

C.  The Products-Completed Operations Aggregate Limit is the most we will pay for all damages included in the **products-completed operations hazard.**

D.  Subject to Paragraphs B and C above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of all damages arising out of any one **occurrence**, offense, or **law enforcement services wrongful act.**

   All related or interrelated **law enforcement services wrongful acts** arising out of a common nexus of facts or circumstances shall be deemed to be one **law enforcement services wrongful act**.  If one **law enforcement services wrongful act** (as determined by the application of the prior sentence) results in **bodily injury, property damage**, and/or **personal and advertising injury**, all such damages will be grouped together and treated as one **law enforcement services wrongful act**, and a single Each Occurrence Limit and **Retained Amount** shall apply.

E.  The limits of insurance of this policy apply to the **policy period** regardless of the length of the **policy period** including any extension thereof.

F.  We will not make any payment under this policy unless and until the **Retained Amount** has been exhausted by the payment of damages (and/or **defense expenses**, if applicable) to which this insurance applies:

**SECTION V - DEFINITIONS**

A.  **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

   1.  Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   2.  Regarding websites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an **advertisement.**

B.  **Allied health program** means an educational program training students to become allied health professionals, including nurses, medial assistants, dental assistants, athletic trainers, audiologists, emergency medical technicians, phlebotomists, dental lab technicians, physical therapists, respiratory therapists, x-ray technicians, paramedics, lab technicians, certified nurse assistants, and similar allied health professionals; but **allied health program** does not include any programs that train:

LX8444 (01/09)                              Page 13 of 29

    1. physicians of any sort including dentists and osteopathic physicians,

    2. purfusionists,

    3. chiropractors,

    4. midwives, or

    5. anesthetists.

C. **Auto** means:

    1. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

    2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

With respect to Paragraphs 1. and 2. above, such **auto** must be used within the scope of your business at the time of the **occurrence**.

However, **auto** does not include **mobile equipment**.

D. **Bodily injury** means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. **Bodily injury** includes mental anguish or other mental injury resulting from **bodily injury**.

E. **Clinic** means a clinic, medical facility, or hospital owned by you which has the primary or exclusive purpose of providing or rendering professional health care services to students, but does not include, any clinic, medical facility, or hospital that has the primary or exclusive purpose of providing or rendering professional health care services to the general public.

F. **Coverage territory** means:

    1. The United States of America, including its territories and possessions, Puerto Rico and Canada; or

    2. Anywhere else in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

If we are prohibited by law from providing a defense in any location described in this definition and we are obligated to provide such defense, we will reimburse you for **defense expenses** incurred with our consent under the terms and conditions of this policy.

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (**OFAC**).

G. **Defense expenses** means:

    1. Attorney's fees and all other investigation, loss adjustment and litigation expenses;

    2. Premiums on bonds to release attachments for amounts not exceeding the applicable limits of insurance of this policy, but we are not obligated to apply for or furnish any such bond;

3. Premiums on appeal bonds required by law to appeal a judgment in a **suit** for amounts not exceeding the applicable limits of insurance of this policy, but we are not obligated to apply for or furnish any such bond;

4. All court costs taxed against the **Insured** in the **suit**;

5. Pre-judgment interest awarded against the **Insured** on that part of the judgment within the applicable limits of insurance of this policy we pay.  If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest accruing after we make such offer; and

6. Post-judgment interest that accrues after entry of judgment on that part of the judgment within the applicable limits of insurance of this policy we pay, and before we have paid, offered to pay or deposited in court that part of the judgment that is within the applicable limits of insurance of this policy.

H.   **Employee** includes a **leased worker**.  **Employee** does not include a **temporary worker**.

I.   **Executive officer** means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

J.   **Hostile fire** means a fire that becomes uncontrollable or breaks out from where it was intended to be.

K.   **Incidental medical malpractice injury** means **bodily injury** arising out of the rendering of or failure to render the following professional health care services:

1. medical, surgical, dental, x-ray, physical therapy, or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

2. the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

However, coverage for **incidental medical malpractice injury** applies only if services are provided by an **Insured** as defined in subparagraphs M.2.l. and M.2.m. of SECTION V – DEFINITIONS.

L.   **Impaired property** means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because:

1. It incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or

2. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1. The repair, replacement, adjustment or removal of **your product** or **your work**; or

2. Your fulfilling the terms of the contract or agreement.

M.   **Insured** means:

1. The **Named Insured**;

2. Except for liability arising our of the ownership, maintenance, or use of **autos**;

   a. If you are designated in the Declarations as:

      (1) An individual, you and your spouse are **Insureds**, but only with respect to the conduct of a business of which you are the sole owner;

(2) A partnership or joint venture, you are an **Insured**.  Your members and your partners, and their spouses are also **Insureds**, but only with respect to the conduct of your business;

(3) A limited liability company, you are an **Insured**.  Your members are also **Insureds**, but only with respect to the conduct of your business.  Your managers are **Insureds**, but only with respect to their duties as your managers;

(4) An organization other than a partnership, joint venture or limited liability company, you are an **Insured**.  Your **executive officers** and directors are **Insureds**, but only with respect to their duties as your officers or directors.  Your stockholders are also **Insureds**, but only with respect to their liability as stockholders;

(5) A trust, you are an **Insured**.  Your trustees are also **Insureds**, but only with respect to their duties as trustees;

b.  Your **volunteer workers** only while performing duties related to the conduct of your business.  Your **employees** other than your **executive officers** (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.  However, none of these **employees** or **volunteer workers** are insureds for:

(1) **Bodily injury** or **personal and advertising injury**:

(i) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co- **employee** in the course of his or her employment or performing duties related to the conduct of your business or to your other **volunteer workers** while performing duties related to the conduct of your business; or any claim or **suit** brought by or on behalf of the spouse, child, parent, brother or sister of that co-**employee** or **volunteer worker** as a consequence of such **bodily injury** or **personal and advertising injury**, or;

(ii) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(i) above.

(2) **Property damage** to property:

(i) Owned, occupied or used by,

(ii) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of **your employees, volunteer workers,** any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

c.  Any person (other than your **employee** or **volunteer worker**) or organization while acting as your real estate manager;

d.  Your legal representative if you die, but only with respect to duties as such.  That representative will have all your rights and duties under this policy.

e.  Any trustees or members of your Board of Governors if you are a private charitable or educational institution, but only with respect to their duties as your trustees or members.

f.  Any member of your board or commission if you are a public board or commission, but only with respect to their duties as members of your board or commission.

g. Any student teachers teaching as part of their educational requirements, but only with respect to their duties as your student teachers.

h. Any student while working offsite as part of an Intern Program or Work Study Program, but only with respect to such student's conduct within the scope of the Intern Program or Work Study Program.

i. Any faculty member or teaching assistant, but only with respect to their duties as your faculty members or teaching assistants.

j. Any committee members or representatives to any educational associations of which you are a member, but only with respect to their duties as your committee members or representatives to such educational associations.

k. Any former **employees** or **volunteer workers**, but only with respect to the duties they had performed on behalf of the university with your knowledge and consent and in accordance with terms and conditions of the policy, including, but not limited to, the terms applicable to present **employees** and **volunteer workers** under subparagraph M.2.b. of this definition.

l. Any physician, dentist, nurse, athletic trainer, personal fitness trainer, or other medical practitioner employed or retained by you, but only while rendering or failing to render professional health care services at your **clinic** or at a college/university sponsored activity.

m. Any student, intern, or instructor, but only while performing duties in a college/university sponsored **allied health program**.

n. Any subsidiary over which you maintain ownership or majority interest, but only if you owned or controlled it on the effective date of this Policy.

o. Any association, club, or other organization, and your **employees** who are members thereof, provided such entity is for social or recreational purposes with your knowledge and consent.

3. Only with respect to liability arising out of the ownership, maintenance, or use of **autos**, provided that, Auto Liability is shown on the Schedule of Retained Amounts:

   a. You are an **Insured**;

   b. Anyone else while using with your permission an **auto** you own, hire, or borrow is also an **Insured** except:

      (1) The owner or anyone else from whom you hire or borrow an **auto**. This exception does not apply if the **auto** is a trailer or semi-trailer connected to a **auto** you own;

      (2) Your **employee** if the **auto** is owned by that **employee** or a member of his or her household;

      (3) Someone using a **auto** while he or she is working in a business of selling, servicing, repairing, parking or storing **autos** unless that business is yours;

      (4) Anyone other than your **employees**, partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their **employees**, while moving property to or from a **auto**;

      (5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a **auto** owned by him or her or a member of his or her household;

      **(6) Employees** with respect to **bodily injury** to any fellow **employee** of the **Insured** arising out of and in the course of the fellow **employee's** employment or while performing duties related to the conduct of your business;

   **c.** Anyone liable for the conduct of an **Insured** described above is also an **Insured**, but only to the extent of that liability.

**4.** Notwithstanding any of the above, no person or organization is an **Insured** with respect to the conduct of any current, past or newly formed partnership, joint venture or limited liability company that is not designated as a **Named Insured**.

**N.** **Insured contract** means that part of any contract or agreement pertaining to your business under which any **Insured** assumes the tort liability of another party to pay for **bodily injury, property damage,** or **incidental medical malpractice injury** to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**Insured contract** does not include that part of any contract or agreement:

**1.** That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**2.** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   **a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   **b.** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**3.** Under which the **Insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **Insured's** rendering or failure to render professional services, including those shown in subparagraph 2 above and supervisory, inspection, architectural or engineering activities, or

**4.** That indemnifies or defends an independent contractor or the company that employs such independent contractor for a **law enforcement services wrongful act**.

**O.** **Loading or unloading** means the handling of property:

**1.** After it is moved from the place where it is accepted for movement into or onto an aircraft or watercraft;

**2.** While it is in or on an aircraft or watercraft; or

**3.** While it is being moved from an aircraft or watercraft to the place where it is finally delivered;

but **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft or watercraft.

**P.** **Law enforcement services wrongful act** means an act, error, omission, mistake, or malpractice by an **Insured** or an independent contractor while conducting law enforcement or security activities related to the conduct of your business and within the scope of the **Insured's** or independent contractor's duties for you, which results in **bodily injury, property damage,** or **personal and advertising injury**.

Notwithstanding any other provision of this policy to the contrary, no independent contractor performing law enforcement or security activities is an **Insured** under this policy and as such, we will not indemnify or defend such independent contractor, including, if applicable, the company that employs such independent

contractor.  We will, however, indemnify and/or defend you for the **law enforcement services wrongful acts** of such independent contractor.  Notwithstanding any other provision of this policy to the contrary, this insurance shall be excess over any **other insurance** providing coverage to such independent contractor.

**Q.** **Leased worker** means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. **Leased worker** does not include a **temporary worker.**

**R.** **Mobile equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

  1.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

  2.  Vehicles maintained for use solely on or next to premises you own or rent;

  3.  Vehicles that travel on crawler treads;

  4.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      a.  Power cranes, shovels, loaders, diggers or drills; or

      b.  Road construction or resurfacing equipment such as graders, scrapers or rollers;

  5.  Vehicles not described in Paragraph 1, 2, 3 or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      a.  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      b.  Cherry pickers and similar devices used to raise or lower workers;

  6.  Vehicles not described in Paragraph 1, 2, 3 or 4 above maintained primarily for purposes other than the transportation of persons or cargo.

  However, self-propelled vehicles with the following types of permanently attached equipment are not **mobile equipment**, but will be considered **autos:**

      a.  Equipment designed primarily for:

          (1) Snow removal;

          (2) Road maintenance, but not construction or resurfacing; or

          (3) Street cleaning;

      b.  Cherry pickers and similar devices mounted on an automobile or truck chassis and used to raise or lower workers; and

      c.  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

  However, **mobile equipment** does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **autos.**

LX8444 (01/09)                    **Page 19 of 29**

Named Insured means:

1. Any person or organization designated in Item 1 of the Declarations; or

2. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a **Named Insured** if there is no other similar insurance available to that organization.  However, coverage does not apply to **bodily injury, property damage, incidental medical malpractice injury** or **law enforcement services wrongful act** that occurred before you acquired or formed the organization, or **personal and advertising injury** arising out of an offense committed before you acquired or formed the organization.

We may, at our option, make an additional premium charge for any organization that you acquire or form during the **policy period**.

T. **Occurrence** means:

1. As respects **bodily injury** or **property damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **occurrence**.

2. As respects **personal and advertising injury**, an offense arising out of your business that causes **personal and advertising injury**.  All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

3. As respects **incidental medical malpractice injury**, all **bodily injury** sustained by one person (including all related loss of consortium claims or **suits**) regardless of the number of **Insureds** against whom the claims are made or **suits** are brought, the number of claimants, or the length of time over which such **bodily injury** occurs.

U. **Other insurance** means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy which is excess of the **Retained Amount**.  **Other insurance** does not include insurance written to be specifically excess of this policy.

V. **Personal and advertising injury** means injury arising out of your business, including consequential **bodily injury**, arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

4. Oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

5. Oral or written publication, in any manner, of material that violates a person's right of privacy;

6. The use of another's advertising idea in your **advertisement**; or

7. Infringement upon another's copyright, trade dress or slogan in your **advertisement**.

8. **Website injury** caused by an offense committed in the course of a visual or audio presentation of material on **your website**.

In addition to the above offenses as set forth in Paragraphs 1. through 7. above, inclusive, (but not including Paragraph 8. above), the following offenses are also covered, provided that, such offenses arise out of a **law enforcement services wrongful act:**

1. **Discrimination,** unless uninsurable by law;

2. Humiliation;

3. False or improper service of process;

4. Violation of property rights;

5. Excessive use of force (including without limitation assault and battery). However, we will not defend the individual or individuals that committed this offense once a final judicial determination has been made that such individual or individuals were criminally liable; or

6. Violation of civil rights protected under any federal, state or local law or statute.

As used in this definition, **discrimination** means the violation of any applicable United States federal, state, or local law, regulation, or ordinance which protects individuals on the basis of race, color, religion, age, sex, disability, pregnancy, national origin, sexual orientation or other protected category or characteristic.

W.   **Policy period** means the period of time shown in Item 2 of the Declarations from the inception date to the earlier of the expiration date or the effective date of cancellation of this policy.

X.   **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Y.   **Products-completed operations hazard** means all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of **your product** or **your work** except:

1. Products that are still in your physical possession; or

2. Work that has not yet been completed or abandoned. However, **your work** will be deemed completed at the earliest of the following times:

   a. When all of the work called for in your contract has been completed;

   b. When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

   c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**Products-completed operations hazard** does not include **bodily injury** or **property damage** arising out of:

1. The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you and that condition was created by the loading or unloading (meaning **loading or unloading** but with respect to a vehicle) of that vehicle by any **Insured;** or

2. The existence of tools, uninstalled equipment or abandoned or unused materials.

). **Property damage** means:

1. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured.  All such loss of use will be deemed to occur at the time of the **occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

AA. **Retained Amount** means the amount shown on the Schedule of Retained Amounts which is applicable to all scheduled coverages.

BB. **Suit** means a civil proceeding in which damages because of **bodily injury, property damage, personal and advertising injury, incidental medical malpractice injury,** or a **law enforcement services wrongful act,** to which this policy applies are alleged.  **Suit** includes:

1. An arbitration proceeding in which such damages are claimed and to which the **Insured** must submit or does submit with our consent; or

2. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **Insured** submits with our consent.

C. **Temporary worker** means a person who is furnished to you to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions.

DD. **Volunteer worker** means a person who is not your **employee** and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

EE. **Website injury** means injury arising out of one of more of the following offenses:

1. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2. Oral, written or electronic publication of material that violates a person's right of privacy; or

3. Oral, written or electronic publication of material that violates a person's right of publicity.

FF. **Your product** means:

1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   a. You;

   b. Others trading under your name; or

   c. A person or organization whose business or assets you have acquired; and

    2.  Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your product** includes:

    1.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**; and

    2.  The providing of or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

**GG.** **Your website** means all computer files and date which may be accessed via the internet using a Universal Resource Locator that includes any domain name owned by or assigned to you.

**HH.** **Your work** means:

    1.  Work or operations performed by you or on your behalf; and

    2.  Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

    1.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Work**; and

    2.  The providing of or failure to provide warnings or instructions.

## SECTION VI - CONDITIONS

**A. Appeals**

In the event the first **Named Insured** elect(s) not to appeal a judgment in excess of the **Retained Amount**, we may elect to make such appeal at our own cost and expense, and we shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall our liability for damages exceed the sum set forth in the Declaration's for any one **occurrence**, including the cost and expense of such appeal.

**B. Bankruptcy or Insolvency**

Your receivership, bankruptcy, insolvency or inability to pay will not relieve us from the payment of damages covered by this policy. But under no circumstances will such receivership, bankruptcy, insolvency or inability to pay in any way increase or expand our liability or require us to drop down.

**C. Cancellation**

    1.  The first **Named Insured** shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

    2.  We may cancel this policy by mailing or delivering to the first **Named Insured** written notice of cancellation at least:

        a.  10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

        b.  90 days before the effective date of cancellation if we cancel for any other reason.

    3.  We will mail or deliver our notice to the first **Named Insured's** last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The **policy period** will end on that date.

5. If this policy is canceled, we will send the first **Named Insured** any premium refund due. If we cancel, the refund will be pro rata. If the first **Named Insured** cancels, earned premium will be calculated in accordance with the customary short-rate table and procedure, subject to the Minimum Earned Premium shown in Item 4.C. of the Declarations. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**D. Change In Control**

If during the **policy period**:

1. the first **Named Insured** designated in Item 1 of the Declarations consolidates with or merges into, or sells all or substantially all of its assets to any person or entity; or

2. any person or entity acquires an amount of the outstanding ownership interests representing more than 50% of the voting or designation power for the election of directors of the first **Named Insured** designated in Item 1 of the Declarations, or acquires the voting or designation rights of such an amount of ownership interests;

This policy will continue in full force and effect as to: (1) **bodily injury, property damage, incidental medical malpractice injury**, or a **law enforcement services wrongful act** that occurs prior to the effective date of such transaction or (2) **personal and advertising injury** caused by an **occurrence** that takes place prior to the effective date of such transaction. There will be no coverage afforded by this policy for **bodily injury** or **property damage**, **incidental medical malpractice injury**, or a **law enforcement services wrongful act** that occurs on or after the effective date of such transaction and **personal and advertising injury** caused by an **occurrence** that takes place on or after the effective date of such transaction.

**E. Changes**

Notice to or knowledge possessed by any person shall not affect a waiver or change in any part of this policy or stop us from asserting any rights under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part hereof, signed by an authorized representative of the Company.

**F. Duties in the Event of an Occurrence, Offense, Law Enforcement Services Wrongful Act, Claim or Suit**

1. You shall immediately notify us in writing of any **occurrence**, any offense, or **law enforcement services wrongful act** which may result in a claim or **suit** which:

   a. Involves serious **bodily injury**, including but not limited to, burns, spinal cord injury, amputation, brain damage, loss of eyesight or hearing, a fatality, or

   b. Any claim or **suit** which is likely to exceed 25% of the **Retained Amount** (including **defense expenses**, if such **defense expenses** are included within the **Retained Amount** as described in the Schedule of Retained Amounts), or

   c. You receive notice of a claim or **suit** in which the damage demand exceeds the **Retained Amount**.

   Knowledge of an **occurrence**, offense, or **law enforcement services wrongful act** by your agent, your servant, or your **employee** will not in itself constitute knowledge by you, unless the Director of Risk Management (or person with a similar or equivalent title) or his/her designee received such notice.

2. If notice is required under the terms of Paragraph 1. above, then to the extent possible, notice should include:

LX8444 (01/09)                          Page 24 of 29

   a.  How, when and where the **occurrence**, offense, or **law enforcement services wrongful act,** took place;

   b.  The names and addresses of any injured persons and any witnesses; and

   c.  The nature and location of any injury or damage arising out of the **occurrence**, offense, or **law enforcement services wrongful act.**

3.  If notice is required under the terms of Paragraph **1.** above, you must immediately notify us on the assumption that an **Insured** is liable for the damages claimed.

    Written notice should be mailed or delivered to:

    Lexington Insurance Company
    100 Summer Street
    Boston, MA 02110
         Attention: Claims Department

4.  You and any other involved **Insured** must:

    a.  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **suit;**

    b.  Authorize us to obtain records and other information;

    c.  Cooperate with us in the investigation, settlement or defense of the claim or **suit;** and

    d.  Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the **Insured** because of injury or damage to which this insurance may also apply.

5.  No **Insured** will, except at that **Insured's** own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

G.  **Examination of Your Books and Records**

    We may audit and examine your books and records as they relate to this policy at any time during the **policy period** and for up to three (3) years after the expiration or termination of this policy.

H.  **Inspection**

    We have the right, but are not obligated, to inspect your premises and operations at any time.  Our inspections are not safety inspections.  They relate only to the insurability of your premises and operations and the premiums to be charged.  We may give you reports on the conditions that we find.  We may also recommend changes.  We do not, however, undertake to perform the duty of any person or organization to provide for the health or safety of your **employees** or the public.  We do not warrant the health and safety conditions of your premises or operations or represent that your premises or operations comply with laws, regulations, codes or standards.

I.  **Legal Actions Against Us**

    No person or organization has a right under this policy:

    1.  To join us as a party or otherwise bring us into a **suit** asking for damages from an **Insured;** or

    2.  To sue us under this policy unless all of its terms have been fully complied with.

LX8444 (01/09)                               **Page 25 of 29**

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an **Insured**; but we will not be liable for damages that are not payable under this policy or that are in excess of the applicable limits of insurance of this policy.  An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

J.  **Other Insurance**

If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the **other insurance**.  However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

K.  **Premium and Audit**

1.  We will compute all premiums for this policy in accordance with our rules and rates.

2.  If the premium for this policy is a flat premium, it is not subject to adjustment, except that additional premiums may be required for any additional exposures and/or **Insureds**.

3.  The Premium shown in Item 4.A. of the Declarations as the Total Advance Premium is a deposit premium only.  If the policy is subject to audit adjustment, the actual exposure base will be used to compute the earned premium.  If the earned premium is greater than the Total Advance Premium, the first **Named Insured** will pay the difference to us due and payable upon notice.  Subject to the Annual Minimum Premium shown in Item 4.B. of the Declarations, if the earned premium is less than the Total Advance Premium, we will return the difference to the first **Named Insured**.

4.  The first **Named Insured** must keep records of the information we need for premium computation, and send us copies at such times as we may request.  The first **Named Insured** shown on the Declarations is responsible for the payment of all premiums and will be the payee for any return premiums we pay.

L.  **Representations**

By accepting this policy, you agree:

1.  The statements in the Declarations are accurate and complete;

2.  Those statements are based upon representations you made to us;

3.  We have issued this policy in reliance upon your representations; and

4.  This policy is void in any case of a material misrepresentation by you as it relates to this policy or any claim or **suit** under this policy.

M.  **Separation of Insureds**

Except with respect to the limits of insurance of this policy and rights or duties specifically assigned to the first **Named Insured** designated in Item 1 of the Declarations, this insurance applies:

1.  As if each **Named Insured** were the only **Named Insured**; and

2.  Separately to each **Insured** against whom a claim is made or **suit** is brought.

N.  **Transfer of Rights of Recovery**

1.  If any **Insured** has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us.  The **Insured** must do nothing after loss to impair these rights and must help us enforce them.

LX8444 (01/09)                              **Page 26 of 29**

The preceding paragraph applies, except under the following circumstance:

a. If you have waived the liability of any person or organization as part of a written agreement between you and such person or organization, and

b. Such written agreement was entered into prior to the **occurrence**, offense, or **law enforcement services wrongful act**, whichever is applicable, then

in the event of our payment under this Policy, we will waive our right of subrogation against such person or organization.

2. Any recoveries will be applied as follows:

a. Any person or organization, including the **Insured**, that has paid an amount in excess of the applicable limits of insurance of this policy will be reimbursed first;

b. We then will be reimbursed up to the amount we have paid; and

c. Lastly, any person or organization is entitled to claim the remainder, including the **Insured**, if such person or organization  that has paid an amount over which this policy is excess.

Expenses incurred in the exercise of rights of recovery will be apportioned among the persons or organizations, including the **Insured**, in the ratio of their respective recoveries as finally settled.

**O. Transfer of Your Rights and Duties**

Your rights and duties under this policy may not be transferred without our written consent.

If you die or are legally declared bankrupt, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. However, notice of cancellation sent to the first **Named Insured** designated in Item 1 of the Declarations and mailed to the address shown in this policy will be sufficient notice to effect cancellation of this policy.

**P. Unintentional Errors and Omissions**

1. The unintentional failure by you or any **Insured** to provide accurate and complete representations as of the inception of the Policy will not prejudice the coverage afforded by this Policy.

2. The unintentional failure by you or any **Insured** to notify us of an **occurrence**, offense, **law enforcement services wrongful act**, claim or **suit** will not prejudice the coverage afforded by this Policy.

**Q. Service of Suit**

It is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we, at your request, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA 02110, or his or her representative, and that in any **suit** instituted against us, upon this policy, we will abide by the final decision of such court or of an appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, we hereby designate the Superintendent, Commissioner, Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as our true and lawful

attorney upon whom may be served any lawful process in any action, **suit** or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA 02110, as the person to whom such officer is authorized to mail such process or a true copy thereof.

**R.   Arbitration**

Notwithstanding Condition Q. Service of Suit, above, in the event of a disagreement as to the interpretation of this policy (except with regard to whether this policy is void or voidable), it is mutually agreed that such dispute shall be submitted to binding arbitration before a panel of three (3) Arbitrators consisting of two (2) party-nominated (non-impartial) Arbitrators and a third (impartial) Arbitrator (hereinafter **umpire**) as the sole and exclusive remedy.

The party desiring arbitration of a dispute shall notify the other party, said notice including the name, address and occupation of the Arbitrator nominated by the demanding party.  The other party shall, within 30 days following receipt of the demand, notify in writing the demanding party of the name, address and occupation of the Arbitrator nominated by it.  The two (2) arbitrators so selected shall, within 30 days of the appointment of the second Arbitrator, select an umpire.  If the Arbitrators are unable to agree upon an umpire, the selection of the umpire shall be submitted to the Judicial Arbitration and Mediation Services (hereinafter, **JAMS**).   The umpire shall be selected in accordance with Rule 15 (as may be amended from time to time) of the **JAMS** Comprehensive Arbitration Rules and Procedures for the selection of a sole arbitrator.

The parties shall submit their cases to the panel by written and oral evidence at a hearing time and place selected by the umpire.  Said hearings shall be held within 30 days of the selection of the umpire.  The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles.  The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud and gross misconduct by the Arbitrators.  The award will be issued within 30 days of the close of the hearings.  Each party shall bear expenses of its designated Arbitrator and shall jointly and equally share with the other expenses of the umpire and the arbitration.

The arbitration proceeding shall take place in the vicinity of the first **Named Insured's** mailing address as shown in the Declarations or such other place as may be mutually agreed by the first **Named Insured** and us.  The procedural rules applicable to this arbitration shall, except as provided otherwise herein, be in accordance with the JAMS Comprehensive Arbitration Rules and Procedures.

IN WITNESS WHEREOF, the Insurance Company identified on the Declarations has caused this policy to be signed by its President, Secretary and a duly authorized representative of the Insurance Company.

_____
**PRESIDENT**

_____
**SECRETARY**

## SCHEDULE OF RETAINED AMOUNTS

| TYPE OF COVERAGE | RETAINED AMOUNT | APPLICATION | DEFENSE EXPENSES |
|---|---|---|---|
| General Liability | $   150,000 | Each Occurrence | ☒   Within and Reduce **Retained Amount** |
| Auto Liability | $   250,000 | Each Occurrence | ☐   In Addition to **Retained Amount** |
| Employer's Liability | $1,000,000 | Each Occurrence | Applies to all Types of Coverage.  If neither box is marked, then **Defense Expenses** are in addition to the **Retained Amount**. |
| Incidental        Medical Malpractice Liability | $   150,000 | Each Occurrence | |
| Law        Enforcement Professional        and Security        Services Liability | $   150,000 | Each Occurrence | |
| | | | |

The following provisions apply to the above Schedule of Retained Amounts:

**A.  Application Column**

The **Retained Amount** shall apply to each Type of Coverage on an **Each Occurrence** basis regardless of the number of persons or organizations who sustain damages or the number of claims made or **suits** brought as a result of any one **occurrence**, offense, or **law enforcement services wrongful act.**

**B.  Defense Expenses Column**

1.  Regardless of the Type of Coverage, if the **Within and Reduce Retained Amount** box is marked in the Defense Expenses Column, then the **Retained Amount** shall be reduced by damages and/or **defense expenses** to which this insurance applies.

2.  Regardless of the Type of Coverage, if the **In Addition to Retained Amount** box is marked in the Defense Expenses Column, then the **Retained Amount** shall be reduced only by damages to which this insurance applies.

ENDORSEMENT # 001

**This endorsement, effective 12:01 AM** 09/01/2009

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

## PATROL® ACCESS ENDORSEMENT

This endorsement modifies insurance provided by the policy:

The Insurer provides the Named Insured with access during the policy period to AIG Consultants, Inc.'s Planning and Tracking Response Online (PATROL®) Program through PATROL's® website (https://www.aigpatrol.com). The PATROL® Program is a crisis management solution that provides the Named Insured with access to a global network of leading providers of crisis preparation and response services. The Named Insured can view online information about each service provider including company description, brochures, links, white papers, and press releases as well as complete and submit an online Request for Proposal (RFP) or a Work Order for Services. If the service providers response meets the Named Insured's criteria then the two companies can enter into an agreement for services.

The following services provider categories are available through PATROL®: Business Continuity/Disaster Recovery Planning, Workplace Violence, Public Relations, Employee Inventory, Threat & Vulnerability Assessment, Incident/Evacuation Drills, Incident Command, Sabotage & Terrorism, Chemical/ Bioterrorism, Insurance Products, Event Management Software, Pollution, Kidnap & Ransom, Background Checks, Natural Disasters, Medical/Political Evacuation, Cyberterrorism, Executive/VIP Protection, Investigations, Physical Security, and Business Intelligence.

The above referenced services are provided at no cost to the Named Insured and no premium has been allocated for these services. As such, the Insurer reserves the right to change or discontinue these services at the Insurer's sole discretion and without notice to the Named Insured.

All other terms and conditions of the policy remain the same.

_David Bressmer_
_____
**Authorized Representative OR
Countersignature (In states where applicable)**

LX8031 (01/07)

ENDORSEMENT # 002

**This endorsement, effective 12:01 AM** 09/01/2009

**Forms a part of policy no.:**  003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

### MINIMUM EARNED PREMIUM

It is understood and agreed that in the event of cancellation of this policy by or at the direction of the Insured, the Company shall retain a Minimum Earned Premium of $144,760.

It is further agreed that the provision regarding cancellation by the Insured is amended to read:

"If the Insured cancels this policy, earned premium will be computed in accordance with the customary short-rate table and procedure, or the Minimum Earned Premium stated herein, whichever is greater".

*David Bresnahan*
_____
**Authorized Representative OR
Countersignature (In states where applicable)**

LEXCME077(Ed.03/86)
LX0082

POLICY NUMBER: 003628067     ENDORSEMENT # 003

# EMPLOYEE BENEFITS LIABILITY COVERAGE

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.
PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Coverage | Limit Of Insurance | | Deductible | | Premium |
|---|---|---|---|---|---|
| Employee Benefits Programs | $5,000,000 | each employee | $1,000 | each employee | $ INCLUDED |
| | $5,000,000 | aggregate | | | |
| Retroactive Date: | 7/1/2006 | | | | |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** The following is added to Section I - Coverages:
**COVERAGE - EMPLOYEE BENEFITS LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Paragraph E. (Section III - Limits Of Insurance); and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

   b. This insurance applies to damages only if:

      (1) The act error or omission, is negligently commited in the "administration" of your "employee benefit program";

      (2) The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

      (3) A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph c. below, during the policy period or an Extended Reporting Period we provide under Paragraph G. of this endorsement.

   c. A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

      (1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

LX9606 (06/03)     Includes copyrighted Information of the Insurance Services Offices, Inc., with its permission. All rights reserved.

1

(2) When we make settlement in accordance with Paragraph **1.a.** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

d. All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

## 2. Exclusions

This insurance does not apply to:

a. **Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

b. **Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

c. **Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

d. **Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

e. **Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

(1) Failure of any investment to perform;

(2) Errors in providing information on past performance of investment vehicles; or

(3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

f. **Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

g. **ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

h. **Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

i. **Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

j. **Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

B. For the purposes of the coverage provided by this endorsement:

1. All references to Supplementary Payments à Coverages A and B are replaced by Supplementary Payments à Coverages **A, B and Employee Benefits Liability**.

2. Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

C. For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **4.** of **Section II - Who Is An Insured** are replaced by the following:

2. Each of the following is also an insured:

a. Each of your "employees" who is or was authorized to administer your "employee benefit program".

b. Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

   b. Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

D. For the purposes of the coverage provided by this endorsement, Paragraph 3. of **Section II - Who Is An Insured** does not apply.

E. For the purposes of the coverage provided by this endorsement, **Section III - Limits Of Insurance** is replaced by the following:

   1. **Limits Of Insurance**

      a. The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

         (1) Insureds;

         (2) "Claims" made or "suits" brought;

         (3) Persons or organizations making "claims" or bringing "suits";

         (4) Acts, errors or omissions; or

         (5) Benefits included in your "employee benefit program".

      b. The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

      c. Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

         (1) An act, error or omission; or

         (2) A series of related acts, errors, or omissions

negligently committed in the "administration" of your "employee benefit program".

However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

2. **Deductible**

   a. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

   b. The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

   c. The terms of this insurance, including those with respect to:

      (1) Our right and duty to defend any "suits" seeking those damages; and

      (2) Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

      apply irrespective of the application of the deductible amount.

   d. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

Includes copyrighted Information of the Insurance Services Offices, Inc., with its permission. All rights reserved.

**F.** For the purposes of the coverage provided by this endorsement, Conditions 2. and 4. of **Section IV - Conditions** are replaced by the following:

**2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

  a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

   (1) What the act, error or omission was and when it occurred; and

   (2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

  b. If a "claim" is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the "claim" or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

  c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

  d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

  If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

  a. **Primary Insurance**

   This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

  b. **Excess Insurance**

   (1) This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

    (a) No Retroactive Date is shown in the Schedule of this insurance; or

    (b) The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

   (2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

   (3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

   (4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

LX9606 (06/03)     Includes copyrighted Information of the Insurance Services Offices, Inc., with its permission.  All rights reserved.     4

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance of all insurers.

G. For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provision are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

1. You will have the right to purchase an Extended Reporting Period, as described below, if:

   a. This endorsement is canceled or not renewed; or

   b. We renew or replace this endorsement with insurance that:

      (1) Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

      (2) Does not apply to an act, error or omission on a claims-made basis.

2. The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

3. An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

   You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

   We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

   a. The "employee benefit programs" insured;

   b. Previous types and amounts of insurance;

   c. Limits of insurance available under this endorsement for future payment of damages; and

   d. Other related factors.

   The additional premium will not exceed 100% of the annual premium for this endorsement.

   The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

H. For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

1. "Administration" means:

   a. Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

   b. Handling records in connection with the "employee benefit program"; or

   c. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

   However, "administration" does not include handling payroll deductions.

Includes copyrighted Information of the Insurance Services Offices, Inc., with its permission.  All rights reserved.

2. "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

3. "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   a. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

   b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

   c. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

   e. Any other similar benefits designated in the Schedule or added thereto by endorsement.

I. For the purposes of the coverage provided by this endorsement, Definitions 5. and 18. in the **Definitions** Section are replaced by the following:

   5. "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   18. "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

      a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

      b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

ENDORSEMEN₁ # 004

**This endorsement, effective 12:01 AM 09/01/2009**

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TERRORISM EXCLUSION - CERTIFIED AND NON-CERTIFIED ACTS

This insurance does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of an "act of terrorism", which is defined in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007 (collectively, "TRIA") as follows:

   (1) ACT OF TERRORISM. -
      (A) CERTIFICATION. - The term "act of terrorism" means any act that is certified by the Secretary [of the Treasury], in concurrence with the Secretary of State, and the Attorney General of the United States -
         (i) to be an act of terrorism;
         (ii) to be a violent act or an act that is dangerous to -
            (I) human life;
            (II) property; or
            (III) infrastructure;
         (iii) to have resulted in damage within the United States, or outside of the United States in the case of -
            (I) an air carrier or vessel [described in TRIA]; or
            (II) the premises of a United States mission; and
         (iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
      (B) LIMITATION. - No act shall be certified by the Secretary as an act of terrorism if -
         (i) the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
         (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.
      (C) DETERMINATIONS FINAL. - Any certification of, or determination not to certify, an act as an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.
      (D) NONDELEGATION. - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

This insurance also does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of a "non-certified act of terrorism", which means any act that is not an "act of terrorism", as defined above, that
   (1) involves the use of force or violence against person or property;
   (2) is dangerous to human life or property; or
   (3) interferes with or disrupts an electronic or communication system; and
   (4) is undertaken by any group or person, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

96554 (4/08)

    (A) a government;
    (B) the civilian population of a country, state or community; or
    (C) to disrupt the economy of a country, state or community.

  All other terms and conditions of the policy are the same.

_David Bressman_

**Authorized Representative or
Countersignature (in States Where
Applicable)**

ENDORSEMENT # 005

**This endorsement, effective 12:01 AM** 09/01/2009

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

### ANTI-STACKING ENDORSEMENT

This endorsement modifies insurance provided by the policy:

The following condition is added to the policy:

> If this insurance and any other insurance issued to you by us or any member company of American International Group, Inc. apply to the same incident, act, offense, claim, suit, or occurrence, whichever is applicable, the maximum limit of insurance under all insurance available will not exceed the highest applicable limit of insurance available under any one policy.

> However, this condition does not apply to any other insurance issued to you by us or any member company of American International Group, Inc. which is specifically intended to be either primary to or in excess of the policy to which this endorsement is attached.

All other terms and conditions of the policy remain the same.

*David Bressman*

**Authorized Representative OR**
**Countersignature (In states where applicable)**

LX9803 (08/05)

**POLICY NUMBER:** 003628067     **ENDORSEMENT #** 006          **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

### SCHEDULE

**Name of Person or Organization:**
   State of Hawaii

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you.

CG 20 26 11 85          Copyright, Insurance Services Office, Inc., 1984                    Page 1  of 1
LX5184

ENDORSEMENT # 007

**This endorsement, effective** 12:01 AM 09/01/2009

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

### LIMITED POLLUTION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**LEXINGTON HIGHER EDUCATION RETAINED AMOUNT LIABILITY POLICY**

I.   Exclusion **F., Pollution** of **SECTION III - EXCLUSIONS** does not apply to:

    A.  **Bodily injury, property damage, or personal and advertising injury** arising from a **discharge of pollutants** which commenced on a specific, demonstrable date and time after the effective date of this endorsement and before the end of the **policy period**, and which results from or arises out of:

        1.  The **products-completed operations hazard**;

        2.  Explosion, fire, lightning or windstorm damage to any real or personal property owned, occupied or leased by the **Insured**;

        3.  Collision, overturning or upset of any automobile, mobile equipment or railroad vehicle;

        4.  Vandalism or malicious mischief to any real or personal property owned, occupied or leased by the **Insured**;

        5.  The accidental upset, dropping, breaking, falling, splashing, or rupture of any above ground container of pollutants or the escape of any fumes from such above ground container;

        6.  The application of pesticides, herbicides, or swimming pool chemicals on or at a premises owned or rented by you; or

        7.  Smoke, fumes, vapor, or soot from equipment used to heat or cool a building.

    You must notify us of any **discharge of pollutants** for which coverage is provided under Paragraph **A.** of this endorsement in accordance with Paragraph **F.** of **SECTION VI - CONDITIONS** of the policy.

    B.  **Bodily injury, property damage, or personal and advertising injury** arising from a **discharge of pollutants** not covered under Paragraph **A.** of this endorsement, provided that:

        1.  The **discharge of pollutants** commenced on a specific, demonstrable date and time during the period of this policy,

        2.  You discover the **discharge of pollutants** within twenty (20) days of such commencement and take reasonable action to contain, control or mitigate such **discharge of pollutants**; and

        3.  You comply with the Special Notice provision below, which shall be a condition precedent to coverage under this Paragraph **B.**, whether or not we are prejudiced by the your failure to comply with the Special Notice provision below.

**Special Notice**

With respect to notice of a **discharge of pollutants** under Paragraph B., you shall give us written notice via registered or certified mail of the **discharge of pollutants** within eighty (80) days of the commencement of such **discharge of pollutants**. Such written notice shall not be rendered invalid if any part of the eighty (80) day period in which to provide such notice extends beyond the end of the **policy period**.

You must include the following items in your written notice to us:

1. Where the **discharge of pollutants** took place,

2. The circumstances under which the **discharge of pollutants** occurred,

3. The circumstances under which the you first became aware of the **discharge of pollutants**,

4. The nature of and duration of such **discharge of pollutants**, and

5. The environmental impact of such **discharge of pollutants**.

YOU MUST ALSO COMPLY WITH PARAGRAPH F. OF **SECTION VI - CONDITIONS** OF THE POLICY.

II. Under this endorsement, all **bodily injury**, **property damage**, or **personal and advertising injury** arising out of or resulting from the same, related or continuous **discharge of pollutants**, shall be considered one **occurrence**, and shall be deemed to have taken place in its entirety only during the **policy period** in which the **discharge of pollutants** commenced. The Limits of Insurance applicable to the **policy period** in which the **discharge of pollutants** commenced shall apply to all such **bodily injury**, **property damage**, or **personal and advertising injury**.

III. In addition to all of the exclusions set forth in **SECTION III - EXCLUSIONS** which apply to this endorsement, the following additional exclusions apply to this endorsement.

This endorsement does not apply to:

a. **Bodily injury**, **property damage**, or **personal and advertising injury** arising from the handling, storage, disposal, dumping, processing or treatment of **pollutants** at any site or location not owned or operated by you or used by you, or by others on your behalf.

b. Any punitive, exemplary or multiplied damages or statutory assessments, or any civil, administrative or criminal fines or penalties.

c. **Environmental damage** to property owned, occupied or leased by or in the care, custody and control of any **Insured**.

d. **Bodily injury**, **property damage**, or **personal and advertising injury** arising from any **Insured's** intentional, knowing, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body. However, this exclusion shall not apply to any intentional **discharge of pollutants** solely for the purpose of mitigating or avoiding imminent **bodily injury**, **property damage**, or **personal and advertising injury** which would be covered by this policy.

e. **Environmental damage** existing on any property prior to any **discharge of pollutants**.

f. **Bodily injury**, **property damage**, or **personal and advertising injury** arising out of or resulting from acid rain.

IV. The definitions of the policy apply to this endorsement. However, the following additional definitions in boldfaced type are applicable to this endorsement supersede any similar definitions in the policy to the contrary:

a. **Discharge of pollutants** means the discharge, dispersal, seepage, migration, release or escape of **pollutants**. **Pollutants** means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and **waste**. **Waste** includes materials to be recycled, reconditioned, or reclaimed.

b. **Property Damage** means:

1. Physical injury to or destruction of tangible property which occurs during the **policy period**, including the loss of use of such tangible property arising therefrom; or

2. Loss of use of such tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an **occurrence** during the **policy period**; or

3. **Environmental damage** which occurs during the **policy period**.

c. **Environmental damage** means physical damage to soil, surface water or groundwater, or plant or animal life, caused by a **discharge of pollutants** and giving rise to **cleanup costs**

d. **Cleanup costs** means expenses incurred in the removal or remediation of soil, surface water, groundwater, or other contamination resulting from a **discharge of pollutants**, provided such expenses:

1. Are specifically mandated by any governmental entity duly acting under the authority of environmental law(s), national or local statutes, codes or other laws (including common law) or legislation concerning health or safety or environmental matters pursuant to which the **Insured** has or may have a legal obligation; or

2. Have been actually incurred by a governmental entity or by a third party.

All other terms and conditions of the policy remain the same.

_David Bresvrber_
_____
**Authorized Representative OR**
**Countersignature (In states where applicable)**

ENDORSEMENT # 008

**This endorsement, effective 12:01 AM** 09/01/2009

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

### NO FAULT, UNINSURED MOTORISTS, PERSONAL INJURY PROTECTION EXCLUSION

It is agreed that the coverage afforded by this policy, shall not apply with respect to any liability arising out of any Claims brought under "No Fault", Uninsured/Underinsured Motorists, or Personal Injury Protection Laws or Statutes or similar legislation.

_David Bresvalar_
_____
**Authorized Representative OR**
**Countersignature (In states where applicable)**

LEXCME081 (09/02)
LX0086

ENDORSEMENT # 009

**This endorsement, effective 12:01 AM 09/01/2009**

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

THIS ENDORSEMENT ADDS ACCIDENT INSURANCE TO THE POLICY UNDER THE TERMS AND CONDITIONS STATED HEREIN. PLEASE READ IT CAREFULLY.

ACCIDENT INSURANCE ENDORSEMENT

**NOTICE:  THIS ENDORSEMENT PROVIDES ACCIDENT ONLY COVERAGE.  IT DOES NOT COVER SICKNESS OR DISEASE.**

**NOTICE:  COVERAGE IS NOT PROVIDED TO ANY OTHERWISE ELIGIBLE PERSON IF THE NAMED INSURED IS DOMICILED IN INDIANA, IOWA, MASSACHUSETTS, MISSOURI, NORTH CAROLINA, PENNSYLVANIA, OR RHODE ISLAND.**

**The words we, us and our refer to the company providing this insurance as stated above.  Other words and phrases that appear in bold face print in this endorsement have special meaning within this endorsement.  Refer to the Accident Insurance Declarations and Accident Insurance Definitions below.**

The Policy is amended as follows:

I.    **ACCIDENT INSURANCE DECLARATIONS**  - The following declarations are added to the Policy and apply only with respect to the coverage provided by this endorsement:

(a) **Accident Insurance Effective Date:**    *"Same as Policy Effective Date"*

(b) **Classification of Eligible Persons:**

Class 1:  All third parties, excluding Class 2.  Class 1 does not include firefighters, police officers, emergency medical technicians or any other emergency services personnel who may be called to the venue or location(s) in the event of an emergency. Additionally, Class 1 does not include prisoners, inmates or detainees of any kind when the Covered Premises is a prison, jail, detention center, lock down facility or any other correctional institution of any kind.

Class 2:  All employees of the **Named Insured** working at least 20 hours per week and who are permanently employed inside the U.S., its territories and possessions, Puerto Rico and Canada.

(c) **Covered Activity (ies):** Coverage is provided for **Injury** sustained by a **Covered Person** while:

**Covered Activity 1: (Class 1)** Lawfully in or on the Covered **Premises** of the **Named Insured**.
**Covered Activity 2: (Class 2)** Actively performing the duties of his or her occupation for the Named Insured.

(d) **Principal Sum Amount**  (per **Covered Person**):    $50,000

(e) **Accident Insurance Aggregate Limit:**         $5,000,000 per occurrence

**II.   ACCIDENT INSURANCE** - The following Accident Insurance Coverage is added to the Policy. The provisions hereunder apply only with respect to the Accident Insurance provided by this endorsement:

**A.   ACCIDENT INSURANCE INSURING AGREEMENT**

We will pay a benefit to the **Covered Person** (or, in the event of death, to the **Covered Person's** beneficiary) if that **Covered Person** suffers a loss covered under this endorsement arising from an **Injury** that results from an accident that occurs on or after the **Accident Insurance Effective Date** and during a **Covered Activity**. The **Principal Sum Amount** and the **Covered Activity(ies)** applicable to each **Covered Person** are set out in the **Schedule**. The benefit amount payable is subject to the Accident Insurance Reduction Schedule found below.

**Accidental Death & Dismemberment and Paralysis Benefit.** If **Injury** to a **Covered Person** results, within 365 days of the date of the accident that caused the **Injury**, in that **Covered Person** suffering any one of the losses or any type of paralysis specified below, the benefit we will pay will be based upon the indicated percentage of the **Principal Sum Amount** shown below for that loss or paralysis:

| For Loss of: | Percentage of Principal Sum Amount Payable |
|---|---|
| Life | 100% |
| Both Hands or Both Feet | 100% |
| Sight of Both Eyes | 100% |
| One Hand and One Foot | 100% |
| One Hand and the Sight of One Eye | 100% |
| One Foot and the Sight of One Eye | 100% |
| Speech and Hearing in Both Ears | 100% |
| One Hand or One Foot | 50% |
| Sight of One Eye | 50% |
| Speech or Hearing in Both Ears | 50% |
| Hearing in One Ear | 25% |
| Thumb and Index Finger of Same Hand | 25% |
| **Quadriplegia** | 100% |
| **Paraplegia** | 50% |
| **Hemiplegia** | 25% |

Loss of a hand or foot means complete severance through or above the wrist or ankle joint. Loss of sight of an eye means total and irrecoverable loss of the entire sight in that eye. Loss of hearing in an ear means total and irrecoverable loss of the entire ability to hear in that ear. Loss of speech means total and irrecoverable loss of the entire ability to speak. Loss of thumb and index finger means complete severance through or above the metacarpophalangeal joint of both digits.

If more than one loss or paralysis is sustained by a **Covered Person** as a result of the same accident, only one amount, the largest, will be paid.

**B.   ACCIDENT INSURANCE EXCLUSIONS**

No coverage shall be provided under this endorsement and no payment shall be made for any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of any of the following excluded risks even if the proximate or precipitating cause of the loss is an accidental bodily injury:

1.   suicide or any attempt at suicide or intentionally self-inflicted **Injury** or any attempt at intentionally self-inflicted **Injury** or any act of autoeroticism.

2.   sickness or disease, or mental incapacity or bodily infirmity whether the loss results directly or indirectly from any of these.

3.   the **Covered Person's** commission of or attempt to commit a crime.

4.   declared or undeclared war, or any act of declared or undeclared war regardless of whether the Policy to which this endorsement is attached provides such coverage.

5. infections of any kind regardless of how contracted, except bacterial infections that are directly caused by botulism, ptomaine poisoning or an accidental cut or wound independent and in the absence of any underlying sickness, disease or condition including but not limited to diabetes.

6. participation in any team sport or any other athletic activity.

7. full-time active duty in the armed forces, National Guard or organized reserve corps of any country or international authority. (Loss caused while on short-term National Guard or reserve duty for regularly scheduled training purposes is not excluded).

8. travel or flight in or on (including getting in or out of, or on or off of) any vehicle used for aerial navigation, if the **Covered Person** is:

   a) riding as a passenger in any aircraft not intended or licensed for the transportation of passengers; or

   b) performing, learning to perform or instructing others to perform as a pilot or crew member of any aircraft; or

   c) riding as a passenger in an aircraft owned, leased or operated by the **Named Insured** or the **Covered Person's** employer.

9. the **Covered Person** being under the influence of intoxicants.

10. the **Covered Person** being under the influence of drugs unless taken under the advice of and as specified by a **Physician**.

11. the medical or surgical treatment of sickness, disease, mental incapacity or bodily infirmity whether the loss results directly or indirectly from the treatment.

12. stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis; aneurysm.

13. the **Covered Person** riding in or driving any type of motor vehicle as part of a speed contest or scheduled race, including testing such vehicle on a track, speedway or proving ground.

## C. ACCIDENT INSURANCE LIMITATIONS

**Accident Insurance Aggregate Limit** - The maximum amount payable under the Accidental Death & Dismemberment and Paralysis Benefit may be reduced if more than one **Covered Person** suffers a loss or paralysis as a result of the same occurrence. The maximum amount payable for all such losses and types of paralysis for all **Covered Persons** will not exceed the amount shown as the **Accident Insurance Aggregate Limit** in the **Schedule**. If the combined maximum amount otherwise payable for all **Covered Persons** must be reduced to comply with this provision, the reduction will be taken by applying the same percentage of reduction to the individual maximum amount otherwise payable for each **Covered Person** for all such losses and types of paralysis. The **Accident Insurance Aggregate Limit** is in addition to the Policy's General Aggregate Limit.

**Accident Insurance Reduction Schedule** - The amount payable for a loss will be reduced if a **Covered Person** is age 70 or older on the date of the accident causing the loss. The amount payable for that **Covered Person's** loss is a percentage of the amount that would otherwise be payable, according to the following schedule:

| AGE ON DATE OF ACCIDENT | PERCENTAGE OF AMOUNT OTHERWISE PAYABLE |
|---|---|
| 70-74 | 65% |
| 75-79 | 45% |
| 80-84 | 30% |
| 85 and older | 15% |

Premium for a **Covered Person** age 70 or older is based on 100% of the coverage that would be in effect if the **Covered Person** were under age 70.

"Age" as used above refers to the age of the **Covered Person** on the **Covered Person's** most recent birthday, regardless of the actual time of birth.

## D.   ACCIDENT INSURANCE DEFINITIONS

**Covered Activity (ies)** - means those activities set out as **Covered Activity (ies)** in the Schedule with respect to which **Covered Persons** are provided coverage under this endorsement.

**Covered Person** - means a person: (1) who is a member of an eligible class of persons as described in the **Classification of Eligible Persons** section of the **Schedule**; and (2) while such person's coverage under this endorsement is in force.

**Covered Premises** - means the physical location of all premises owned by, rented to, leased by the **Named Insured** located inside the U.S., its territories and possessions, Puerto Rico and Canada (including parking lots next to buildings that are maintained by the **Named Insured**). Covered Premises does not include any public road or highway, beach, reservoir or lake. In addition, Covered Premises does not include any vehicle or mode of transportation once it has left the premises of the **Named Insured**. For construction "wrap-up" business, Covered Premises is deemed to be the physical project worksite location(s) covered in the Policy to which this endorsement is attached, during the project term.

**Named Insured** - means the Named Insured shown in the Declarations of the Policy to which this endorsement is attached.

**Hemiplegia** - means the complete and irreversible paralysis of the upper and lower **Limbs** of the same side of the body.

**Immediate Family Member** - means a person who is related to the **Covered Person** in any of the following ways: spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister), or child (includes legally adopted or stepchild).

**Injury** - means an injury to the body: (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's accident coverage is in force; (2) which occurs under the circumstances described in a **Covered Activity** applicable to that person; and (3) which directly (independent of sickness, disease, mental incapacity, bodily infirmity or any other cause) causes a covered loss under this endorsement.

**Limb** - means entire arm or entire leg.

**Paraplegia** - means the complete and irreversible paralysis of both lower **Limbs**.

**Physician** - means a licensed practitioner of the healing arts acting within the scope of his or her license who is not: (1) the **Covered Person**; (2) an **Immediate Family Member**; or (3) retained by the **Named Insured**.

**Quadriplegia** - means the complete and irreversible paralysis of both upper and both lower **Limbs**.

**Schedule** - means the Accident Insurance Declarations section of this endorsement.

## E.   ACCIDENT INSURANCE CLAIMS PROVISIONS

**Notice of Claim.** Written notice of a claim for benefits must be given to us within 20 days after a **Covered Person's** loss, or as soon thereafter as reasonably possible. Such written notice given by or on behalf of the claimant to us in care of AIG Claim Services, P.O. Box 15701, Wilmington, DE 19850-5701, or by calling 1-800-551-0824 with information sufficient to identify the **Covered Person**, is deemed notice to us.

**Claim Forms.** We will send claim forms to the claimant upon receipt of a written notice of claim. If such forms are not sent within 15 days after the giving of notice of a claim, the claimant will be deemed to have met the proof of loss requirements upon submitting, within the time fixed herein for filing proof of loss, written proof covering the occurrence, the character and the extent of the loss for which claim is made. The notice should include the **Covered Person's** name, the **Named Insured's** name and the Policy number .

**Proof of Loss.** Written proof of loss must be furnished to us within 90 days after the date of the loss. Failure to furnish proof within the time required neither invalidates nor reduces any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

**Payment of Claims.** Upon receipt of due written proof of death, payment for loss of life of a **Covered Person** will be made, in equal shares, to the survivors in the first surviving class of those that follow: the **Covered Person's** (1) spouse; (2) children; (3) parents; or (4) brothers and sisters. If no class has a survivor, the beneficiary is the **Covered Person's** estate.

Upon receipt of due written proof of loss, payments for all losses, except loss of life, will be made to (or on behalf of, if applicable) the **Covered Person** suffering the loss. If a **Covered Person** dies before all payments due have been made, the amount still payable will be paid as described above for loss of life.

If any payee is a minor or is not competent to give a valid release for the payment, the payment will be made to the legal guardian of the payee's property. If the payee has no legal guardian for his or her property, a payment not exceeding $1,000 may be made, at our option, to any relative by blood or connection by marriage of the payee, who, in our opinion, has assumed the custody and support of the minor or responsibility for the incompetent person's affairs.

Any payment we make in good faith fully discharges our liability to the extent of the payment made.

**Time of Payment of Claims.** Benefits payable for any loss will be paid immediately upon our receipt of due written proof of the loss.

**Physical Examination and Autopsy.** We at our own expense have the right and opportunity to examine the person of any individual whose loss is the basis of claim hereunder when and as often as we may reasonably require during the pendency of the claim and to make an autopsy in case of death where it is not forbidden by law.

## F.   ACCIDENT INSURANCE ADDITIONAL PROVISIONS

**Accident Insurance Termination Date.** This coverage terminates automatically on the date the Policy terminates. Termination takes effect at 12:01 AM Standard Time at the address of the Named Insured on the date of termination.

**Covered Person's Effective Date.** A **Covered Person's** coverage under this endorsement begins on the latest of: (1) the Accident Insurance Effective Date; (2) the date the person becomes a member of an eligible class of persons as described in the **Classification of Eligible Persons** section of the Schedule; or (3) the date the appropriate premium is paid for the **Covered Person**.

**Covered Person Termination Date.** A **Covered Person's** coverage under this endorsement ends on the earliest of:  (1) the date the Policy is terminated; (2) the date this endorsement is terminated; or (3) the date the **Covered Person** ceases to be a member of any eligible class of persons as described in the **Classification of Eligible Persons** section of the Schedule.

Termination of coverage will not affect a claim for a covered loss that occurred while the **Covered Person's** coverage under this endorsement was in force.

**All other terms, conditions, and exclusions of the Policy shall remain unchanged.**

_David Bresnahan_

**Authorized Representative OR**
**Countersignature (In states where applicable)**

## ENDORSEMENT # 010

This endorsement, effective 12:01 AM 09/01/2009

Forms a part of policy no.: 003628067

Issued to: UNIVERSITY OF HAWAII

By: LEXINGTON INSURANCE COMPANY

### CRISIS RESPONSE COVERAGE EXTENSION ENDORSEMENT

This endorsement modifies insurance provided by the policy:

o   CRISIS RESPONSE NOTIFICATION TELEPHONE NUMBER:  888-790-7233

THIS ENDORSEMENT EXTENDS COVERAGE TO PROVIDE FOR "CRISIS RESPONSE COSTS" AND "CRISIS MANAGEMENT LOSS" IN THE EVENT OF A "CRISIS EVENT" AS DEFINED HEREIN. THE LIMITS OF INSURANCE PROVIDED FOR SUCH COVERAGE ARE IN ADDITION TO THE LIMITS OF INSURANCE PROVIDED IN THE DECLARATIONS OF THIS POLICY. IF THIS ENDORSEMENT IS ATTACHED TO A CLAIMS-MADE POLICY, THIS ENDORSEMENT NEVERTHELESS REQUIRES THAT ALL OF THE CRITERIA SET FORTH IN SECTION I., SUBPARAGRAPHS B.1. THROUGH B.4., INCLUSIVE, BE MET.

### SCHEDULE

| Crisis Response Coverage Extension | Limits of Insurance | |
|---|---|---|
| Crisis Response Aggregate Limit | $300,000 | |
| Each Crisis Response Costs Limit | $250,000 | Each "Crisis Event" |
| Each Crisis Management Loss Limit | $50,000 | Each "Crisis Event" |

Notwithstanding any provisions to the contrary in the policy to which this endorsement is attached, subject to the Limits of Insurance as shown in the above Schedule and in accordance with the terms and conditions set forth in this endorsement, the policy is extended to provide "crisis response costs" and "crisis management loss" resulting from a "crisis event".

### SECTION I. - CRISIS RESPONSE COVERAGE EXTENSION

A.  We will reimburse you or pay on your behalf reasonable and necessary "crisis response costs" and/or "crisis management loss" arising out of: (1) "bodily injury" or "property damage" for which coverage is provided under this policy, or (2) "imminent injury", but only with respect to a "crisis event" to which this insurance applies. The amount we will reimburse you or pay on your behalf for such "crisis response costs" and/or "crisis management loss" is limited as described in SECTION III - CRISIS RESPONSE LIMITS OF INSURANCE. No self-insured retention or deductible shall apply to this coverage extension endorsement.

B.  We will reimburse you or pay on your behalf "crisis response costs" and/or "crisis management loss" arising out of a "crisis event" only if:

1.  The "bodily injury" or "property damage" or "imminent injury" takes place in the "coverage territory"; and

2.  The "bodily injury" or "property damage" or "imminent injury" commences to occur during the policy period, and

3.  Such "crisis response costs" and/or "crisis management loss" did not arise out of any fact, circumstance, pre-existing condition, situation, "bodily injury", "property damage", or "imminent injury" that you, prior to the inception date of this policy, knew, or reasonably should have known, could lead to, cause or result in such "crisis response costs" and/or "crisis management loss", and

4. Such "crisis response costs" and/or "crisis management loss" are incurred within thirty (30) days after the commencement date of the "crisis event". The end of the policy period will not cut short this thirty (30) day period.

## SECTION II. - EXCLUSIONS

The exclusions of the policy apply to this endorsement, including, but not limited to, any exclusion which applies to workers compensation or any similar law. However, the following additional exclusions applicable to this endorsement supersede any similar exclusions in the policy.

This coverage extension does not apply to:

**Newly acquired or merged entities**

"Crisis response costs" or "crisis management loss" resulting from "bodily injury" or "property damage" or "imminent injury" that occurred prior to the date you acquired or merged with any other entity.

**Infectious Diseases or Illnesses**

"Crisis response costs" or "crisis management loss" arising out of infectious diseases or illnesses caused by any bacterium, virus, or fungus. However, this exclusion does not include, food-borne illnesses or defective vaccines.

## SECTION III. - CRISIS RESPONSE LIMITS OF INSURANCE

A. The Schedule above and the rules below establish the most we will reimburse or pay on your behalf for "crisis response costs" and "crisis management loss" regardless of the number of Insureds, "crisis events", or "affected persons".

B. The Crisis Response Aggregate Limit is the most we will reimburse or pay on your behalf for the sum of all "crisis response costs" and "crisis management loss" under this endorsement.

C. Subject to Paragraph B. above, the Each Crisis Response Costs Limit is the most we will reimburse or pay on your behalf for all "crisis response costs" arising out of any one "crisis event".

D. Subject to Paragraph B. above, the Crisis Management Loss Limit is the most we will reimburse or pay on your behalf for all "crisis management loss" arising out of any one "crisis event".

All "crisis events" or all related or interrelated "crisis events" will be deemed to be one "crisis event".

## SECTION IV. - DEFINITIONS

The definitions of the policy apply to this endorsement. However, the following additional definitions applicable to this endorsement supersede any similar definitions in the policy.

You and your refer to the Named Insured and we, us and our refer to the Company providing this insurance. Other words and phrases that appear in quotation marks have special meaning as follows:

A. "Affected persons" means those individuals who suffer direct "bodily injury" or "property damage", or directly experience "imminent injury", including such individuals immediate family members.

B. "Bodily injury" means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time.

C. "Coverage territory" means the United States of America, including its territories and possessions, Puerto Rico and Canada.

If coverage for "crisis response costs" or "crisis management loss" under this endorsement is in violation of any United States of America's economic or trade sanction, including, but not limited to, sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") then coverage for such "crisis response costs" or "crisis management loss" shall be null and void.

D. "Crisis event" means a man-made emergency situation, including, but not limited to, arson, a bombing, the taking of hostages, a mass shooting, terrorism (if covered under the policy only), intentional contamination of food, drink, or pharmaceuticals that results in covered "bodily injury", "property damage" or "imminent injury" to multiple persons and significant adverse regional or national news media coverage.

E. "Crisis management firm" means a public relations firm or crisis management firm, assigned or approved by us in writing, that is hired by you to perform services of the type covered under "crisis management loss" in connection with a "crisis event".

F. "Crisis management loss" means reasonable and necessary fees and expenses incurred by a crisis management firm" or your employees in providing public relations and media management services for the purpose of maintaining and restoring public confidence in you. These expenses may include printing, advertising, or mailing of materials to manage reputational risk. This does not include the salaries of your employees.

G. "Crisis response costs" means:

1. reasonable and necessary "emergency transport expenses", "emergency psychology expenses", funeral expenses, travel expenses, and temporary living expenses incurred by you to provide relief and/or support to "affected persons", and

2. expenses incurred by you to secure the scene of a "crisis event".

"Crisis response costs" shall not include "defense costs" or "crisis management loss".

H. "Defense costs" means legal fees and expenses incurred by you for legal advice or services sought in anticipation of, or upon actual receipt of, a claim alleging liability and seeking damages for "bodily injury", "property damage" or "imminent injury".

I. "Emergency transport expenses" means reasonable and necessary emergency transport expenses, occurring within 24-hours after a "crisis event", to transport an "affected person" sustaining "bodily injury" in a "crisis event" to a medical treatment facility.

J. "Emergency psychology expenses" means reasonable and necessary expenses for psychology or counseling services provided to "affected persons" and incurred within the first fourteen (14) days of a "crisis event". This does not include the costs or expenses of any medications or hospitalizations. Such psychology or counseling services must be approved by the "crisis management firm".

K. "Imminent Injury" means the actual and immediate threat of "bodily injury" or "property damage".

L. "Property damage" means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "crisis event" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

## SECTION V. - CONDITIONS

The general and/or common conditions of the policy apply to this endorsement. However, the following conditions applicable to this endorsement supersede any similar conditions in the policy to the contrary.

**A.  Insured's Duties in the Event of a "Crisis Event"**

1. You must see to it that we are notified by telephone within twenty-four (24) hours of a "crisis event" which may result in "crisis response costs" or "crisis management loss". The call must be made to **888-790-7233**. If necessary, we will provide you with an approved "crisis management firm" unless we agree to accept a "crisis management firm" that you have selected.

2. Thereafter you must provide written notice, as soon as practicable. To the extent possible, this written notice should include:

   a. How, when and where the "crisis event" took place;

   b. The names and addresses of any "affected parties" and witnesses; and

   c. The nature and location of any injury or damage arising out of the "crisis event".

3. If reimbursement is sought directly by you, you must submit a claim for reimbursement of "crisis response costs" and "crisis management loss" within ninety (90) days after incurring such "crisis response costs" or "crisis management loss". Such claim(s) must include invoices and/or receipts supporting such "crisis response costs" or "crisis management loss" for each and every expense in excess of fifty (50) dollars.

4. Written notice and claim submission as required in Paragraphs 1. and 2. of this section, respectively, shall be mailed or delivered to:

   Lexington Insurance Company
   Casualty Claim Department
   100 Summer Street
   Boston, MA  02110

**B.  Anti-Stacking Provision**

If "crisis response costs" and/or "crisis management loss" provided by this coverage extension endorsement are also provided by any other insurance issued to you by us or any of our affiliated companies (whether or not such costs or loss are referred to using these same terms), the maximum limit of insurance under all insurance available shall not exceed the highest applicable limit of insurance available under any one policy or endorsement. This condition does not apply to any other insurance issued by us or any of our affiliated companies specifically intended to apply as excess insurance over this coverage extension endorsement.

All other terms and conditions of the policy remain the same.

_David Bresnahan_
**Authorized Representative OR
Countersignature (In states where applicable)**

ENDORSEMENT #  011

**This endorsement, effective 12:01 AM** 09/01/2009

**Forms a part of policy no.:**  003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

---

**PREMIUM AND AUDIT AMENDATORY ENDORSEMENT**

SECTION VI - CONDITIONS, paragraph K. Premium and Audit is amended to include the following:

5. The premium for this policy will not be subject to audit adjustment unless the earned premium computed at audit is greater than 115% of the Total Advance Premium. If the earned premium is greater than 115% of the Total Advance Premium, the first Named Insured will pay the difference to us, due and payable upon notice.

All other terms and conditions remain unchanged.

_David Bressnahan_
**Authorized Representative OR
Countersignature (In states where applicable)**

LEXDOC021
LX0404

ENDORSEMENT # 012

**This endorsement, effective 12:01 AM** 09/01/2009

**Forms a part of policy no.:** 003628067

**Issued to:** UNIVERSITY OF HAWAII

**By:** LEXINGTON INSURANCE COMPANY

---

### LIMITS OF INSURANCE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the policy:

**HIGHER EDUCATION RETAINED AMOUNT LIABILITY POLICY**

Item 3., Limits of Insurance shown in the Declarations is deleted in its entirety and replaced with the following:

| Item 3. | Limits of Insurance: | |
|---|---|---|
| | Each Occurrence Limit (other than Auto Liability and Employers Liability): | $5,000,000 |
| | Each Occurrence Limit (applicable to Auto Liability only): | $4,750,000 |
| | Each Occurrence Limit (applicable to Employers Liability only): | $4,000,000 |
| | General Aggregate Limit: | $5,000,000 |
| | Products-Completed Operations Aggregate Limit: | $5,000,000 |

All other terms and conditions of the policy remain the same.

*David Bressman*
**Authorized Representative OR
Countersignature (In states where applicable)**

LEXDOC021
LX0404

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| UNIVERSITY OF HAWAII,<br><br>               Plaintiff,<br><br>    vs.<br><br>LEXINGTON INSURANCE COMPANY,<br>a foreign insurance corporation,<br>JOHN DOES 1-100, JANE DOES<br>1-100, DOE CORPORATIONS 1-100,<br>and/or OTHER DOE ENTITIES 1-100,<br><br>               Defendants. | CIVIL NO. _____<br>(Contract)<br><br>DEMAND FOR JURY TRIAL |

## DEMAND FOR JURY TRIAL

Plaintiff UNIVERSITY OF HAWAII, by and through its undersigned attorneys, hereby demands trial by jury on all triable issues herein.

DATED:   Honolulu, Hawaii,   JUL 3 0 2013 _____.

_____
MARK J. BENNETT
BRANDI B. BALANDA

Attorneys for Plaintiff
UNIVERSITY OF HAWAII

| STATE OF HAWAIʻI<br>CIRCUIT COURT<br>OF THE FIRST CIRCUIT | SUMMONS<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER |
|---|---|---|
| PLAINTIFF,                               VS.<br>UNIVERSITY OF HAWAII, | DEFENDANT.<br>LEXINGTON INSURANCE COMPANY,<br>a foreign insurance corporation, JOHN DOES 1–100, JANE DOES 1-100, DOE CORPORATIONS 1–100, and/or OTHER DOE ENTITIES 1-100, | |

**PLAINTIFF'S ADDRESS (NAME, ADDRESS, TEL. NO.)**

MARK J BENNETT      2672-0
BRANDI B. BALANDA   9271-0
Starn O'Toole Marcus & Fisher
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone No.: (808) 537-6100

## TO THE ABOVE-NAMED DEFENDANT(S)

You are hereby summoned and required to file with the court and serve upon

Mark J. Bennett, Esq. and Brandi B. Balanda, Esq. of Starn O'Toole Marcus & Fisher
_____ ,
plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| DATE ISSUED<br>JUL 3 0 2013 | CLERK | |
|---|---|---|
| I do hereby certify that this is full, true, and correct copy of the original on file in this office | Circuit Court Clerk | |

In accordance with the Americans with Disabilities Act and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the First Circuit Court Administration Office at PHONE NO. 539-4333, FAX 539-4322, or TTY 539-4853, at least ten (10) working days prior to your hearing or appointment date.

Reprographics (07/11)                                                                    SUMMONS TO ANSWER CIVIL COMPLAINT  1C-P-787